1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10    MARK CZARNECKI,                          CASE NO. C15-0421JLR

11              Plaintiff,                      ORDER ON MOTIONS FOR
                                               SUMMARY JUDGMENT
12         v.

13    UNITED STATES OF AMERICA,

14              Defendant.

15                      **I.     INTRODUCTION**

16         Before the court are two motions:  (1) Plaintiff Mark Czarnecki's motion for

17    partial summary judgment (Pltf. Mot. (Dkt. # 30)) and (2) Defendant United States of

18    America's ("the Government") motion for summary judgment (US Mot. (Dkt. # 33)).

19    The court has considered the motions, the submissions of the parties filed in support

20    thereof and opposition thereto, the relevant portions of the record, and the applicable law.

21    In addition, the court heard the oral argument of counsel on September 23, 2016.  Being

22

ORDER- 1

fully advised, the court DENIES Dr. Czarnecki's motion and GRANTS in part and DENIES in part the Government's motion.

## II.    BACKGROUND

### A.  Overview

This lawsuit for false arrest and battery under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), arises out of events that occurred on April 1, 2012, when Dr. Czarnecki and his family were inspected by United States Customs and Border Protection ("CBP") after arriving at Seattle-Tacoma International Airport ("SeaTac") on a flight originating in Mexico.  During the inspection process, CPB Officers discovered that an Oregon court had issued a protection order that prohibited Dr. Czarnecki from having various types of contact with his wife and daughter with whom Dr. Czarnecki was traveling.  CBP Officers detained Dr. Czarnecki while they contacted Port of Seattle Police ("POSP") to investigate the matter.  A scuffle ensued between Dr. Czarnecki and CPB Officers after the CBP Officers attempted to handcuff him.  The CBP Officers eventually handcuffed Dr. Czarnecki and detained him while POSP Officers responded to the scene, investigated the protection order at issue, and declined to arrest Dr. Czarnecki.

### B.  The CBP Checkpoint at SeaTac

CBP is responsible for screening all foreign visitors, American citizens returning from abroad, and imported cargo that enters the United States.  (Stead Decl. (Dkt. # 32) ¶ 2.)  CBP operates the port of entry at SeaTac.  (*Id.* ¶ 5.)  All passengers arriving at SeaTac from foreign countries go through an inspection process, which begins with the Passenger Analysis Unit ("PAU").  (*Id.* ¶ 7.)  CBP Officers in the PAU run various

security, criminal, and background checks on all arriving passengers while their flights are still in the air, and highlight relevant information in the system for the Primary Officers in Passport Control Primary. (*Id.*)

Passengers arriving from foreign countries at SeaTac initially enter Passport Control Primary. (*Id.* ¶ 8.) Primary CBP Officers, located at booths, screen family members travelling together at the same time. (*Id.* ¶ 9.) The Primary CBP Officer scans the declaration and passports of each family member. (*Id.*) If PAU discovered relevant information concerning a passenger during PAU's background checks, this information will appear on the Primary CBP Officer's computer screen. (*Id.*) If a passenger is the subject of any records contained in the Treasury Enforcement Communication System ("TECS"),[1] these records will also appear on the Primary CBP Officer's screen. (*Id.*)

Once primary inspection is complete, Primary CBP Officers refer passengers to either Soft Secondary (new arriving immigrants), Passport Secondary (passengers with immigration concerns), or Baggage Control. (*Id.* ¶ 10.) Baggage Control has four carousels where passengers retrieve their baggage. (*Id.* ¶ 12.) After retrieving their baggage, passengers proceed through the Egress Exit Checkpoint. (*Id.* ¶ 13.) The Checkpoint is operated by three CBP Officers at three podiums. (*Id.*) These CBP

---

[1] TECS is principally owned and managed by CBP and is CBP's principal law enforcement and anti-terrorism database system. (Stead Decl. at 2 n.2.) TECS is "an overarching law enforcement information collection, analysis, and sharing environment that securely links telecommunications devices and personal computers to a central system and database." (*Id.*) TECS databases contain temporary and permanent enforcement, inspection and intelligence records relevant to CBP's anti-terrorism and law enforcement mission and numerous other federal agencies that it supports. (*Id.* at 2-3 n.2.)

1  Officers check passengers' declarations and conduct any additional inspection necessary

2  before allowing passengers to proceed through the Checkpoint.  (*Id.*)  Once passengers

3  are through the Checkpoint, they have completed the inspection process and may exit the

4  airport or board a connecting flight.  (*Id.*)

5      Any passenger arriving at SeaTac on a foreign flight may also be referred to

6  Baggage Secondary.  (*Id.* ¶ 14.)  A CBP Officer may refer a passenger to Baggage

7  Secondary at any time—from the beginning of the inspection process at PAU to the end

8  of the process before they pass through the Egress Checkpoint.  (*Id.*)  A CBP Officer may

9  refer a passenger to Baggage Secondary for any reason.  (*Id.*)

10     Baggage Secondary is a private area, and passengers retrieving baggage at the

11 carousels or proceeding through the Egress Checkpoint cannot see into Baggage

12 Secondary.  (*Id.* ¶ 15.)  Baggage Secondary is equipped with four stations where CBP

13 Officers perform inspections.  (*Id.* ¶ 16.)  CBP Officers use their discretion and conduct

14 an inspection based on their experience and the factors known to them at the time,

15 including but not limited to, the reason the passengers were referred, the number and age

16 of the passengers, the behavior and demeanor of the passengers, and any concurrent

17 activities or circumstances that arise in Baggage Secondary.  (*Id.*)  CBP Officer may

18 change how they conduct inspections at times depending on the information they

19 discovere during an interview, items they find during a search, and/or a passenger's

20 reaction to the inspection.  (*Id.*)

21 //

22 //

Baggage Secondary contains two private rooms where officers may search passengers during the inspection process.  (*Id.* ¶ 17.)  CBP Officers perform searches with the door closed and with a second CBP Officer present.  (*Id.*)

## C. The Events of April 1, 2012

On April 1, 2012, Dr. Czarnecki was returning home from a vacation in Mexico with his wife, daughter, and one of his daughter's friends.  (Cartwright Decl. (Dkt. ## 27, 31) Ex. 8 ("Czarnecki Dep.") at 9:7-22.)  They arrived at SeaTac and proceeded to Passport Control Primary to begin the inspection process.  (*Id.* Ex. 2 at USA000353.)  As part of the inspection process, Dr. Czarnecki completed a Customs Declaration on behalf of himself indicating that he was traveling with two family members.  (US Mot. Ex. A at 1.)  Dr. Czarnecki gave his passport to the CBP Officer at Passport Control Primary.  (Cartwright Decl. Ex. 2 at USA000353; US Mot. Ex. A at 7.)

After the CBP Officer scanned Dr. Czarnecki's passport, a TECS record of an "NCIC Protection Order Record" appeared showing  that Dr. Czarnecki was the subject of a protection order and his wife and daughter were the persons protected under the order.  (Cartwright Decl. Ex. 2 at USA0003535; US Mot. Ex. A at 2-5, 7.)  The TECS record states in part:

> The subject is restrained from assaulting, threatening, abusing, harassing, following, interfering, or stalking the protected person and/or child of the protected person. . . . No contact agreement, to have no offensive contact with the victim.

(Cartwright Decl. Ex. 1 at USA 000338 (capitalization omitted); US Mot. Ex. A at 3 (capitalization omitted).)  The TECS record warns:

1        Warning – The following is an NCIC protection order record.  Do not
2        search, detain, or arrest based solely on the record.  Contact entering agency
        to confirm status and terms of protection order.

3  (Cartwright Decl. Ex. 1 at USA000337 (capitalization omitted); US Mot. Ex. A at 2

4  (capitalization omitted).)  The TECS record shows that the originating agency for the

5  protection order was the Wasco County Sheriff's Office in The Dalles, Oregon, and the

6  record also contains a phone number to confirm the terms of the order as well as a phone

7  number for the Sheriff's Office.  (*See* Cartwright Decl. Ex. 1 at USA000338-39; *see* US

8  Mot. Ex. A at 3-4.)

9        Because Dr. Czarnecki was traveling with the subjects listed in the protection

10  order, the CBP Officer at Passport Control Primary referred the family to Baggage

11  Secondary.  (US Mot. Ex. A at 7 ("Since the subject was traveling with the subjects listed

12  in the Protection Order he was referred to baggage control secondary for further

13  examination . . . ."); Cartwright Decl. Ex. 2 at USA000353 (same).)  CBP Officer James

14  Fukuda was assigned to complete the family's inspection in Baggage Secondary.  (US

15  Mot. Ex. A at 12.)  Officer Fukuda looked at the TECS record and verified that Dr.

16  Czarnecki had an outstanding protection order, and his wife and daughter, with whom Dr.

17  Czarnecki was traveling, were the protected persons.  (US Mot. Ex. A at 8, 12;

18  Cartwright Decl. Ex. 9 ("Fukuda Dep.") at 20:17-21:1.)  Officer Fukuda informed his

19  supervisor that he had verified the TECS record, but he did not inform his supervisor

20  about the warning on the protection order to "not search, detain, or arrest based solely on

21  this record," and he did not inform his supervisor that the TECS record said to "[c]ontact

22  [the] entering agency to confirm status and terms of protection order."  (*Id.* at 21:6-18.)

1   As Officer Fukuda explained, he did not place "great meaning" on the warnings

2   contained in the TECS record because "at the border or border equivalent," CBP "can

3   search any person or item, customs, coming through from a foreign territory" and "detain

4   a . . . person or item in order to conduct [CBP's] business."  (*Id.* at 15:7-19.)

5        Officer Fukuda's supervisor, CBP Officer Joseph Stead, testified that the CBP

6   Officers were authorized to conduct a pat-down on Dr. Czarnecki and to handcuff him as

7   well.  (Cartwright Decl. Ex. 10 ("Stead Dep.") at 63:3-22.)  According to supervising

8   CBP Officer Stead, "[w]hen someone has a protection order or . . . a warrant for their

9   arrest or any other issue that pertains to local law enforcement, [CBP's] protocol [is] to

10  pat[-]down and to handcuff."  (*Id.* at 63:8-11.)  Here, Officer Stead approved the pat-

11  down, handcuffing, and detention of Dr. Czarnecki based on the fact that Dr. Czarnecki

12  was traveling with the individuals covered by the protective order.  (*Id.* at 51:1-19.)

13       CBP Officer Michael Andrews assisted Officer Fukuda with the family's

14  inspection in Secondary Baggage.  (US Mot. Ex. A at 8, 12; Cartwright Decl. Ex. 7

15  ("Andrews Dep.") at 6:19-23.)  CBP Officer Andrews did not notice anything remarkable

16  about the family or their interaction at the time he first encountered them:  "They were

17  just traveling as a family."  (*Id.* at 7:9-11.)  CBP Officer Fukuda did not see or recall Dr.

18  Czarnecki acting in any threatening or abusive manner toward Mrs. Czarnecki, but noted

19  that "since they were together in the airport, it was possible that he was following her."

20  (Fukuda Dep. at 22:1-7, 22:19-23:12.)

21       After the family members collected their bags, CBP Officers Fukuda and Andrews

22  approached the family and escorted them to Baggage Secondary.  (US Mot. Ex. A at 8,

14.)  The CPB Officers separated Dr. Czarnecki from his wife and daughter.  (*Id.*;

Cartwright Decl. Exs. 4, 7; Andrews Dep. at 25:25-26:3; Answer (Dkt. # 12) ¶ 3.1.)  The

Officers took Dr. Czarnecki to one of the four inspection stations inside Baggage

Secondary.  (US Mot. Ex. A at 8, 14.)  They searched Dr. Czarnecki's luggage at the

inspection station and asked him to empty his pockets onto the inspection belt.  (*Id.*;

Cartwright Decl. Exs. 4 at USA000359, 5 at USA000357.)  The CPB Officers then

escorted Dr. Czarnecki into one of the private rooms located immediately behind the

inspection station.  (*Id.*; US Mot. Ex. A at 8, 14.)  CBP Officer Andrews performed a pat-

down search on Dr. Czarnecki, including a shoe check, with the door closed for privacy.

(*Id.*; *see also* Fukuda Dep. at 28:21-29:24; Andrews Dep. at 15:17-16:11; 28:16-18.)

Next, the Officers asked Dr. Czarnecki to face the wall and put his hands behind his back.

(Fukuda Dep. at 29:25-30:6, 32:5-22;  Andrews Dep. at 16:19-17:19, 21:11-16; US Mot.

Ex. A at 8, 14.)  Initially, Dr. Czarnecki complied and faced the wall.  (*Id.*; Cartwright

Decl. Ex. 5; Fukuda Dep. at 32:5-13.)

     At this point, the facts recited by the parties diverge.  Dr. Czarnecki contends that

"without explanation or warning, Officer Andrews began to handcuff [him]."  (Pltf. Mot.

at 6; *see* Cartwright Decl. Ex. 8 ("Czarnecki Dep.") at 21:9-21.)  Dr. Czarnecki maintains

that, in surprise, he tried to turn to face the officers, asking, "What are you doing?"  (*Id.*

at 21:17-21 ("And I turned around to see what was going on.  That was a shock to me

because no one had said anything was going to happen.  No one explained anything. . . .

And I said, 'What are you –' 'What are you doing?'".)  On the other hand, Officer

Andrews testifies that he took out his handcuffs and began to say, "For your and our

1    safety" when Dr. Czarnecki pulled his hands to the front and attempted to turn around to

2    face the Officers, asking something to the effect of:  "What're you doing?  What's going

3    on?"  (US Mot. Ex. A at 8, 12; *see also* Andrews Dep. at 18:2-6; Fukuda Dep. at 33:1-9.)

4         The parties dispute whether Dr. Czarnecki turned at the sound of the handcuffs or

5    because CBP Officer Andrews began to place them on Dr. Czarnecki's wrist.  (*Compare*

6    Andrews Dep. at 18:2-19:2 *and* Fukuda Dep. at 33:20-34:7 *with* Czarnecki Dep. at 29:2-

7    17.)  "However, it is undisputed that Dr. Czarnecki turned 'while the [CBP O]fficers

8    were attempting to handcuff' him."  (Pltf. Mot. at 6 n.2 (quoting Cartwright Decl. Ex. 2);

9    Czarnecki Dep. at 29:21-30:5 ("I remember my head was for sure turned around.  How

10   much of my body turned at that time, I can't tell you exactly. . . . I predominantly turned

11   my head to see what was going on.").)

12        It is also undisputed that CPB Officers Andrews and Fukuda responded to Dr.

13   Czarnecki's movement with force in an attempt to complete his handcuffing.  (Cartwright

14   Decl. Ex. 4 ("Officer Fukuda and I both pushed [Dr.] Czarnecki against the wall to

15   control the situation.") (some capitalization omitted); *see also* US Mot. Ex. A at 8, 11.)

16   Ultimately, CBP Officer Andrews struggled with Dr. Czarnecki, and they both ended up

17   on the floor.  (Cartwright Decl. Ex. 4 ("I took Czarnecki to the ground.") (capitalization

18   omitted); US Mot. Ex. A at 8 ("[CBP Officer] Andrews struggled with Czarnecki and fell

19   to the ground.") (capitalization omitted); Czarnecki Dep. at 21:25-22:2 ("The two of them

20   just tackled me, like a football.  One hit me in the middle, I think; one hit me in the top,

21   and we just fell that way.").)  Although CBP Officer Andrews had successfully placed a

22   handcuff on Dr. Czarnecki's right wrist, Dr. Czarnecki's left wrist remained under his

1  body on the floor.  (Cartwright Decl. Exs. 4, 5 at USA000357; Andrews Dep. at 26:18-

2  27:10; Czarnecki Dep. at 29:10-20.)

3         Officer Fukuda pushed the alarm button.  (Cartwright Decl. Ex. 4.)  Five other

4  CBP Officers responded to the alarm:  supervising CBP Officer Stead and CBP Officers

5  Amra Thomas, Matthew Ruppert, Galvin Proffer, and Han Nguyen.  (US Mot. Ex. A at

6  8-16.)  Several of these officers assisted Officer Andrews in placing Dr. Czarnecki, who

7  was on the floor, in the appropriate position to complete his handcuffing.  (Cartwright

8  Decl. Exs. 4, 5 at USA000357; Andrews Dep. at 28:19-29:11; Cartwright Decl. Ex. 10

9  ("Stead Dep.") at 74:21-75:7, 77:16-78:7, 78:15-17.)  CBP Officer Fukuda used a

10  pressure point control tactic on Dr. Czarnecki's inner ear, but it was ineffective.  (US

11  Mot. Ex. A at 8.)  After a period of confusion in which multiple officers were giving

12  directions to Dr. Czarnecki, including telling Dr. Czarnecki to stop resisting and to give

13  his hand to the officers (*Id.* at 13, 15), supervising CPB Officer Stead directed that only

14  CBP Officer Fukuda should provide commands to Dr. Czarnecki.  (Stead Dep. at

15  79:22-80:8, 113:21-114:3.)  Eventually, Officer Andrews was able to secure both

16  handcuffs on Dr. Czarnecki.  (Cartwright Decl. Exs. 4, 5 at USA000357; Stead Dep. at

17  95:2-6; Czarnecki Dep. at 95:2-6.)

18         The Government maintains that Dr. Czarnecki resisted officers while he was on

19  the ground by holding his hands close to his body and kicking his feet.  (US Mot. Ex. A

20  at 8-9, 12.)  Dr. Czarnecki maintains that he was not resisting while on the floor and

21  could not give the CBP Officers his hand because it was stuck under his body, and

22  although he tried to tell the CBP Officers his hand was stuck, he "couldn't get them to

1   hear" over the various CBP Officers who were simultaneously shouting orders.

2   (Czarnecki Dep. at 31:18-33:13; 36:20-24.)

3        Once Dr. Czarnecki was handcuffed, CBP Officer Stead told him he could sit on

4   the bench if he cooperated.  (US Mot. Ex. A at 13.)  Dr. Czarnecki agreed, and CBP

5   Officers helped him to his feet and placed him in a sitting position.  (*Id.* at 8, 13-14;

6   Cartwright Decl. Ex. 4.)  Officer Fukuda asked Dr. Czarnecki if he was injured, and Dr.

7   Czarnecki stated that he did not think he was hurt.  (US Mot. Ex. A at 8.)  Officer Fukuda

8   then called the POSP to investigate the validity of the protection order with the issuing

9   agency, and he also informed the POSP that Dr. Czarnecki had resisted CBP Officers.

10   (*Id.*, Ex. E; *see* Fukuda Dep. at 17:18-18:20.)

11        The POSP Officers arrived within 8 minutes of receiving the call from Officer

12   Fukuda.  (US Mot. Ex. A at 8.)  The POSP Officers interviewed Dr. Czarnecki, and his

13   wife and daughter.  (US Mot. Ex. E at 1.)  They also contacted their dispatch and

14   requested that dispatch contact the protective order's originating agency to verify that the

15   order had been served and remained valid.  (*Id.*)  The POSP dispatch advised the

16   investigating POSP Officers that they had received a copy of the protection order and that

17   it had been amended on February 13, 2012, to "No Offensive Contact."  (*Id.*)  Dr.

18   Czarnecki's wife told POSP Officers that the court stated she and Dr. Czarnecki could

19   have contact with each other.  (*Id.*)  Dr. Czarnecki's wife provided a written statement to

20   POSP Officers in which she stated that the protection order had been modified to allow

21   the family to live together, her husband was traveling with her and her daughter on a

22

1    vacation to Mexico, and "no physical altercation happened." (Cartwright Decl. Ex. 6 at

2    POSPD-000006.)

3           While the POSP Officers were conducting their investigation, CBP Officer

4    Fukuda attempted to contact the duty agent for the United States Department of

5    Homeland Security Investigations ("HSI") to report that Dr. Czarnecki had impeded their

6    investigation and assaulted a CBP Officer. (US Mot. Ex. A at 8-9.) Supervising CBP

7    Officer Stead also contacted HSI to request that HSI investigate the incident with Dr.

8    Czarnecki. (*Id.* at 13; Stead Decl. ¶ 22.) Neither Officer heard back from the HSI duty

9    agent before POSP Officers completed their investigation of the protective order. (US

10   Mot. Ex. A at 9; Stead Decl. ¶ 22.) The POSP Officers declined to investigate or pursue

11   charges based on Dr. Czarnecki's altercation with CBP Officers because the incident did

12   not happen in their presence and Dr. Czarnecki did not resist them. (US Mot. Ex. A at 9;

13   Stead Decl. ¶ 22.)

14          As soon as POSP Officers determined not to arrest Dr. Czarnecki based on the

15   protection order, CBP Officers removed Dr. Czarnecki's handcuffs and escorted him out

16   of Baggage Secondary. (US Mot. Ex. A at 9.) After the handcuffs were removed, a

17   POSP Officer observed Dr. Czarnecki "rubbing his right shoulder and bending over in

18   pain." (Cartwright Decl. Ex. 6 at 1.) Dr. Czarnecki's entire detention at SeaTac—from

19   the time he was referred to Baggage Secondary at 19:02 to the time his handcuffs were

20   removed at 20:02—lasted one hour. [2] (*See* US Mot. at Ex. A at 8, 12, 14; Pltf. Mot. at 7

21   _____

22          [2] The Government provides the following timeline:

1   ("Dr. Czarnecki remained handcuffed . . . for almost an hour . . . ."); Stead Dep. at

2   104:25-105:5.)

3   **D. The Present Lawsuit and Motions**

4          On March 18, 2015, Dr. Czarnecki filed suit against the Government under the

5   FTCA and presently alleges claims of false arrest and assault and battery arising out of

6   the April 1, 2012, events. (*See* Compl. (Dkt. # 1); FAC (Dkt. # 10) ¶¶ 4.1 (alleging

7   assault and battery), 4.2 (alleging false arrest).) Both sides have filed motions for

8   summary judgment. (*See* Pltf. Mot.; US Mot.) Dr. Czarnecki seeks partial summary

9   judgment on the following issues: (1) CBP Officer Michael Andrews arrested Dr.

10  Czarnecki the moment that CBP Officer Andrews began to handcuff Dr. Czarnecki; (2)

11  CPB Officer Andrews lacked probable cause to arrest Dr. Czarnecki; and (3) CBP

12  Officers committed the tort of battery under Washington law by forcibly handcuffing Dr.

13  Czarnecki. (Pltf. Mot. at 10.) The Government seeks summary judgment on Dr.

14  Czarnecki's false arrest claim arguing that CBP Officers conducted a lawful border

15

16  | Plaintiff was referred to secondary | 19:02 |
    |---|---|
    | Plaintiff was referred to hard secondary | 19:05 |
    | Plaintiff was escorted to pat-down room | 19:10 |
    | Pat-down search began | 19:10 |
    | Physical altercation occurred | |
    | Plaintiff was placed in seated position | 19:17 |
    | CBP[ Officers] called POSP | 19:20 |
    | CPB[ Officers] called HSI | 19:48 |
    | CBP[ Officers] called HSI a second time | 19:54 |
    | POSP [O]fficers determined no arrest | 19:59 |
    | Handcuffs were removed | 20:02 |
    | Plaintiff exited the Egress Exit Checkpiont | 20:05 |

22  (US Resp. at 9 (citing US Mot. Ex. A at 8, 12, 14).)

1   search and Dr. Czarnecki's brief detention did not rise to the level of an arrest.  (US Mot.

2   at 1.)  The Government also seeks summary judgment on Dr. Czarnecki's assault and

3   battery claims because the CBP Officers' use of force was reasonable under the totality of

4   the circumstances presented.  (*Id.* at 2.)

## III.   ANALYSIS

### A.  Standard of Review

7   The court must grant summary judgment if the movant shows that there is no

8   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

9   of law.  Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the

10  responsibility of informing the court of the basis for its motion, and identifying those

11  portions of the pleadings, discovery responses, and affidavits or declarations, if any,

12  which it believes demonstrate the absence of a genuine dispute of material fact.  *Celotex*

13  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its initial

14  responsibility, the burden then shifts to the opposing party to establish that a genuine

15  dispute of fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574,

16  586 (1986).  Cross-motions for summary judgment are each examined under the same

17  standards.  *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132,

18  1136 (9th Cir. 2001).

### B.  FTCA

20  Dr. Czarnecki brings his claims against the Government based on the FTCA.  The

21  FTCA provides liability for the "negligent or wrongful act or omission of any employee

22  of the Government while acting within the scope of his office or employment, under

1  circumstances where the United States, if a private person, would be liable to the

2  claimant in accordance with the law of the place where the act or omission occurred."  28

3  U.S.C. § 1346(b).  "In assessing the United States' liability under the FTCA, [courts] are

4  required to apply the law of the state in which the alleged tort occurred."  *Conrad v.*

5  *United States*, 447 F.3d 760, 767 (9th Cir. 2006).  Here, the events at issue occurred in

6  Washington State, so its laws apply.

7  **C.  Dr. Czarnecki's Claim for False Arrest**

8      Dr. Czarnecki seeks a ruling on partial summary judgment that he was arrested at

9  the moment that CBP Officers began to handcuff him on April 1, 2012, and that CBP

10  Officer Andrews lacked probable cause to arrest him.  (Pltf. Mot. at 10.)  The

11  Government, on the other hand, seeks summary judgment on Dr. Czarnecki's false arrest

12  claim on grounds that his detention was lawful.  (US Mot. at 10.)

13      In Washington, "[t]he gist of an action for false arrest . . . is the unlawful violation

14  of a person's right of personal liberty or the restraint of that person without legal

15  authority."  *Bender v. City of Seattle*, 664 P.2d 492, 499 (Wash. 1983).  However, it is a

16  complete defense to a claim for false arrest if the plaintiff's detention was lawful.  *See id.*

17  at 500; *Hanson v. City of Snohomish*, 852 P.2d 295, 301 (Wash. 1993); *McKinney v. City*

18  *of Tukwila*, 13 P.3d 631, 641 (Wash. App. 2000) ("[The claimants] have not established

19  an action for false arrest because the officers' actions were reasonable under *Terry* and

20  therefore authorized."); *Vargas Ramirez v. United States*, 93 F. Supp. 3d 1207, 1218

21  (W.D. Wash. 2015) ("[A] lawful seizure . . . is a complete defense to a claim for false

22  arrest.").  The lawfulness of Dr. Czarnecki's detention must be examined in light of the

CBP Officers' authority to act as set forth under federal law and regulations.  *See Ramirez v. United States*, No. C13-2325JLR., 2014 WL 3694274, at *6 (W.D. Wash. July 23, 2014); *see also Cervantes v. United States*, 330 F.3d 1186, 1188 (9th Cir. 2003) (applying California law to FTCA claims for false arrest and false imprisonment by customs agents, but federal law for a determination of whether probable cause existed).

### 1. Dr. Czarnecki's Initial Detention Was Justified as a Routine Border Search

Border searches form "a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause."  *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (quoting *United States v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008)).  Generally, "searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border . . . ."  *United States v. Ramsey*, 431 U.S. 606, 616 (1977).

The Government correctly argues that if a search at the border is routine, officers do not need any level of particularized suspicion to detain an individual to conduct the search.  (US Mot. at 10); *United States v. Ramos-Saenz*, 36 F.3d 59, 61 (9th Cir. 1994) ("The search of [the defendant's] shoes and baggage was a routine border search, and no reasonable suspicion was necessary.").  The Ninth Circuit has established a non-exhaustive list of factors for the court to consider in determining when a border search morphs from a routine to non-routine search, including the use of force, danger to the person whose possessions are being searched, and the psychological intrusiveness of the search.  *See United States v. Bravo*, 295 F.3d 1002, 1006 (9th Cir. 2002).  A border

1   search goes beyond a routine search "only when it reaches the degree of intrusiveness

2   present in a strip search or body cavity search." *Ramos-Saenz*, 36 F.3d at 61 (concluding

3   that the search of the defendant's shoes did not go beyond routine); *see also United States*

4   *v. Duncan*, 693 F.2d 971, 978 (9th Cir. 1982) (concluding that the search of carry-on

5   luggage, pockets, and a wallet, and a superficial pat-down did not involve a serious

6   invasion of personal privacy and dignity).  On the basis of these authorities, the

7   Government argues that the CBP Officers' search of Dr. Czarnecki's baggage and shoes

8   and the pat-down of his person was routine and did not require particularized suspicion.

9   (US Mot. at 10-11.)

10         The Government also argues that the CBP Officers' detention of Dr. Czarnecki for

11   purposes of conducting the search did not rise to the level of an arrest.  (US Mot. at 11-

12   13.)  In general, "[d]etention and questioning during routine searches at the border are

13   considered reasonable within the meaning of the Fourth Amendment." *Bravo*, 295 F.3d

14   at 1008-09.  "During such a search, some period of detention . . . is inevitable.

15   Nevertheless, so long as the searches are conducted with reasonable dispatch and the

16   detention involved is reasonably related in duration to the search, the detention is

17   permissible under the Fourth Amendment." *United States v. Espericueta–Reyes*, 631

18   F.2d 616, 622 (9th Cir. 1980); *see also United States v. Montoya de Hernandez*, 473 U.S.

19   531, 539-40 (1985) ("[N]ot only is the expectation of privacy less at the border than in

20   the interior, the Fourth Amendment balance between the interests of the Government and

21   the privacy right of the individual is also struck much more favorably to the Government

22   at the border.") (citations omitted)).  The standard for determining whether a person

ORDER- 17

1   involved in a border-related detention is under arrest is whether a reasonable innocent

2   person believes that he or she is free to leave after questioning, or more specifically,

3   under the totality of the circumstances, whether such a person would believe that he or

4   she "is being subjected to more than the 'temporary detention occasioned by border

5   crossing formalities.'"  *United States v. Guzman-Padilla*, 573 F.3d 865, 883 (9th Cir.

6   2009) (quoting *United States v. Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001)) (internal

7   citations omitted); *Bravo*, 295 F.3d at 1009.

8        Dr. Czarnecki admits that, up until the moment when CBP Officer Andrews

9   attempted to place him in handcuffs, he had no concerns about his detention, believed

10  that he had been selected for a random search, thought the CBP Officers behaved

11  professionally in conducting the pat-down search of his body, and believed that he would

12  eventually be free to go and catch his connecting flight.  (Czarnecki Dep. at 14:1-15,

13  22:4-24, 24:5-19.)  He did not become concerned about his detention until the point in

14  time when CBP Officer Andrews attempted to place him in handcuffs.  (*Id.* at 29:1-

15  30:22.)  Thus, until the moment of handcuffing, Dr. Czarnecki admits that his detention

16  was a temporary detention related to his search and other border crossing formalities.

17  (Pltf. Resp. (Dkt. # 35) at 8 ("Dr. Czarnecki is not arguing that he was illegally searched

18  or seized when CBP Officers referred him for a secondary inspection, searched his

19  luggage, asked him to empty hid pockets, or conducted a pat-down search.").)

20       The issue, then, is whether the CBP Officers' decision to handcuff Dr. Czarnecki

21  transformed his routine, temporary border detention into something that violated the

22  Fourth Amendment.  (*See id.* ("Dr. Czarnecki's claim is that officers committed the tort

1   of false arrest when they began to handcuff him in order to hold him, without probable

2   cause or even reasonable suspicion, for the [POSP] to investigate whether he had violated

3   a protection order . . . .").)  Dr. Czarnecki asserts that once the CBP Officers attempted to

4   handcuff him, they turned his otherwise routine border search into either a non-routine

5   border search and detention that required reasonable suspicion or an arrest that required

6   probable cause.  (*See id.*)  Dr. Czarnecki argues that a non-routine border search must be

7   supported by "reasonable suspicion" and an arrest at the border must be supported by

8   "probable cause."  (Pltf. Resp. at 8 (citing *Bravo*, 295 F.3d at 1009 (stating that an arrest

9   at the border "must be supported by probable cause") and *Montoya de Hernandez*, 473

10  U.S. at 541 (ruling that a detention to detect alimentary canal smuggling requires

11  reasonable suspicion).)

12         The Government argues that both the United States Supreme Court and the Ninth

13  Circuit have rejected the routine/non-routine framework for analyzing border cases.  (US

14  Reply (Dkt. # 41) at 1.)  The Ninth Circuit has stated that, in *United States v. Flores-*

15  *Montano*, 541 U.S. 149, 152-53 (2004), the Supreme Court "made clear that a showing of

16  'reasonable suspicion' was not required simply because the search in question went

17  beyond a 'routine' search."  *United States v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008).)

18  Dr. Czarnecki argues, however, that *Flores-Montano* did not overrule *Montoya de*

19  *Hernandez*, 473 U.S. 531 (1985), or its holding that "reasonable suspicion was required

20  for 'the detention of a traveler at the border, beyond the scope of a routine customs search

21  and inspection.'"  (Pltf. Reply (Dkt. # 40) at 1-2 (quoting *United States v. Cotterman*, 709

22

F.3d 952, 963 (9th Cir. 2013) (en banc) (quoting *Montoya de Hernandez*, 473 U.S. at 541)).)

The court is inclined to agree with the Government that "[a]t most, the routine/non-routine framework is limited to 'intrusive searches of the person' such as the alimentary canal search in *Montoya de Hernandez*."  (US Reply (Dkt. # 41) at 2.) Because Dr. Czarnecki's search and detention did not approach the level of intrusiveness required in an alimentary canal search, it remained a routine border search for which reasonable suspicion is not necessary.  Nevertheless, the court need not resolve this dispute.  As discussed below, irrespective of whether the Supreme Court has abandoned the routine/non-routine framework for analyzing border searches and related detentions, and irrespective of whether the handcuffing of Dr. Czarnecki turned his search into a non-routine border search or detention, the CBP Officers who detained Dr. Czarnecki had reasonable suspicion to do so.  Thus, CBP Officers were justified in detaining Dr. Czarnecki's regardless of the routine/non-routine framework for border searches and detentions.

### 2.  Even if the CBP Officers' Detention of Dr. Czarnecki Was Non-Routine, It Was Supported by Reasonable Suspicion

The court concludes that the CBP Officers who searched and detained Dr. Czarnecki had reasonable suspicion to do so whether the CBP Officers needed reasonable suspicion at the border or not.  On this point, the court finds *United States v. Vafeades*, No. 2:14-cr-153-DN, 2015 WL 1293388 (D. Utah Mar. 23, 2015), which involved an investigatory stop related to a protection order, to be factually similar and the *Vafeades*

1    court's analysis of whether there was "reasonable suspicion" for the stop to be

2    persuasive.

3         *Valeades* did not involve a border search, but rather the inspection of a

4    commercial truck at a weigh station.  *Id.* at *1.  In *Vafeades*, a commercial vehicle

5    inspector ("CVI") with the Minnesota State Patrol directed a commercial driver to pull

6    his truck into a weigh station for an inspection.  *Id.*  The CVI explained that he was

7    authorized to conduct inspections but did not have authority to arrest or detain anyone.

8    *Id.*  The CVI ran the driver's license through the Criminal Justice Information System

9    ("CJIS") and saw that there was a protection order related to the driver out of Florida.  *Id.*

10   at *2.  Two CVIs at the weigh station noticed subtle but concerning conduct on the part

11   of the driver and his passenger.  *See id.*  After the driver and passenger left the weigh

12   station office, the two CVIs decided that something did not seem right.  *Id.* at *3.  One of

13   the CVIs reviewed the protection order again and noticed that the passenger's first name

14   was listed as one of the protected persons on the order.  *See id.*  The protection order also

15   said:  "Do not search, detain, or arrest based solely on this record.  Contact entering

16   agency to confirm status and terms of protection order."  *Id.* at *3, *9.  The CVIs

17   contacted two state patrol officers and asked them to assist at the weigh station.  *Id.* at *3.

18   One of the CVIs ran out of the office and into the road to prevent the truck from leaving

19   and to ask the driver to come back into the weigh station office.  *Id.*  After the state patrol

20   officers arrived, they verified the validity of the protection order and arrested the driver.

21   *Id.* at *4-*5.

22

1        In considering whether the CVIs had reasonable suspicion to detain the driver, the

2   *Vafeades* court found:

3          Even without considering the unusual behavior of [the driver] or [the
       passenger], [the] CVI . . . had reasonable suspicion that [the driver] was

4          engaged in criminal activity.  When [the CVI] initially ran [the driver's]
       identification to check for "wants and warrants" he saw that [the driver]

5          was the subject of a protection order but did not notice who [the driver] was
       prohibited from contacting.  Immediately after [the driver] left the weigh

6          station at the completion of the commercial vehicle inspection, [the CVIs]
       discussed their concern and reread the CJIS response.  At this point they

7          read the names of the people from whom [the driver] was prohibited from
       having any communications and realized that one of the names was the

8          same as the name [the driver] called the female traveling with him.

9   *Id.* at *7.  Similarly, in the case at hand, the CBP Officers had reasonable suspicion that

10  Dr. Czarnecki was engaged in criminal activity when they recognized that Dr. Czarnecki

11  was traveling with his wife and daughter who were listed as the protected persons on the

12  protection order entered against Dr. Czarnecki.

13       The fact that the protection order in this instance prohibited only "offensive

14  conduct" does not change the court's conclusion that there was reasonable suspicion to

15  detain Dr. Czarnecki.  (Cartwright Decl. Ex. 1 at USA 000338 (capitalization omitted);

16  US Mot. Ex. A at 3 (capitalization omitted).)  The order defined "offensive conduct" to

17  include "following, interfering, or stalking the protected person and/or child of the

18  protected person."  (*Id.*)  Although the CBP Officers did not see any overtly abusive

19  behavior while the family was in their view, the CBP Officers had reasonable suspicion

20  to believe that Dr. Czarnecki may have been "following, interfering, or stalking" his wife

21  and daughter in violation of the protective order simply because Dr. Czarnecki arrived at

22  SeaTac in the company of his family.  Indeed, CBP Officer Fukuda testified, "Well, since

1   they were traveling together in the airport, it was possible that he was following her."

2   (Fukuda Dep. at 23:11-12.)  The CBP Officers had reasonable suspicion necessary  to

3   detain Dr. Czarnecki so that they could investigate whether the trio was indeed traveling

4   together as a family or whether Dr. Czarnecki was in violation of the protective order by

5   "following" his wife and daughter to Mexico, "interfering" with their trip, or "stalking"

6   them on their return to the United States.[3]

7        Nevertheless, Dr. Czarnecki argues that the CBP Officers should not have

8   detained him based on the protection order because the TECS record says:  "Warning—

9    . . . Do not search, detain, or arrest based solely on the record.  Contact entering agency

10  to confirm status and terms of protection order."  (Cartwright Decl. Ex. 1 at USA000337

11  (capitalization omitted); US Mot. Ex. A at 2 (capitalization omitted); *see* Pltf. Mot. at 7-8;

12  Pltf Resp. at 20 ("The problem is that the officers arrived at the suspicion without paying

13  attention to the actual terms of the protection order or contacting the issuing agency to

14  confirm those terms . . . .").)  As explained above, the CBP Officers did not stop Dr.

15  Czarnecki based solely on the TECS record.  They stopped him because, in addition to

16  their knowledge of the protection order, they also learned that Dr. Czarnecki was

17  traveling in the company of his wife and child and therefore could be in violation of the

18

19        [3] The fact that Dr. Czarnecki was simply traveling with his family and was not in

20  violation of the protective order does not negate the CBP Officers' reasonable suspicion of
    criminal activity.  *United States v. Arvizu*, 534 U.S. 266, 277 (2002) ("A determination that
    reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.");

21  *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000) (recognizing that "innocent

22  possibilities . . . do not undermine reasonable suspicion").

ORDER- 23

1   order's prohibitions against "following, interfering, or stalking" the persons protected by

2   the order.  (*See* Fukuda Dep. at 23:11-12.)  Thus, as in *Vafeades*, even in the absence of

3   "unusual behavior," the CBP Officers had a reasonable suspicion, based on the totality of

4   the circumstances, to detain Dr. Czarnecki to investigate a possible violation of the

5   protection order.  *See Vafeades*, 2015 WL 1293388, at *7.

6        Finally, Dr. Czarnecki argues that the language of the TECS report required the

7   CBP Officers to contact the entering agency before the CBP Officers conducted any

8   search or detention based on the protection order.  (*See* Pltf. Mot. at 7-8; Pltf Resp. at 20.)

9   As described above, the TECS report states:  "Contact entering agency to confirm status

10  and terms of protection order."  (Cartwright Decl. Ex. 1 at USA000337 (capitalization

11  omitted); US Mot. Ex. A at 2 (capitalization omitted).)  The report the CVI officer relied

12  upon in *Vafeades* contained nearly identical language to the TECS report, and the driver

13  in *Vafeades* made the same argument as Dr. Czarnecki here.  *See Vafeades*, 2015 WL

14  1293388, at *9.  The *Vafeades* court rejected the driver's argument because it was based

15  on "an erroneous reading" of the language in the report.  *Id.*  The *Vafeades* court noted

16  that the report did not require the CVI officer to contact the originating agency before any

17  investigation or detention could take place.  *Id.*

18       [The report] only warns that detention is not authorized by the existence of
         the order (without facts showing it is being violated) and that the terms of
19       the order should be verified (which was done here).  The report does not
         require investigation or detention be delayed until confirmation with the
20       originating agency.

21

22

*Id.*  The same is true of the nearly identical language used in the TECS report.  Therefore, the CBP Officers were entitled to detain Dr. Czarnecki while they investigated and verified the validity of the protection order.

### 3.  The CBP Officers' Decision to Handcuff Dr. Czarnecki Did Not Convert His Lawful Detention into an Arrest Without Probable Cause

Dr. Czarnecki also argues that the moment it became clear that CBP Officers intended to handcuff him, his border detention morphed from a non-routine search requiring reasonable suspicion into an arrest requiring probable cause.  (Pltf. Mot. at 12 ("Given the totality of circumstances . . . , the [CBP O]fficers' detention of Dr. Czarnecki became an arrest when they moved to handcuff him.").)  "Certainly handcuffing is a substantial factor in determining whether an individual has been arrested, . . . however, handcuffing alone is not determinative."  *Bravo*, 295 F.3d at 1008-09 (citing *Booth*, 669 F.2d at 1236 ("Handcuffing a suspect does not necessarily dictate a finding of custody.  Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody.") (citations omitted) and  *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) ( "[T]he use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, does not necessarily convert a *Terry* stop into an arrest necessitating probable cause.") (internal citations omitted)).

The Ninth Circuit has determined that handcuffing during a border detention does not necessarily transform a detention into an arrest.  For example, in *Bravo*, the Ninth Circuit found that handcuffing and escorting an individual to a security office and

1    searching him for contraband or weapons did not transform a border detention into an

2    arrest.  *See Bravo*, 295 F.3d at 1006.  The Court's conclusion was based in part on the

3    fact that the detainee was told that the handcuffs were only temporary and for safety

4    reasons, was told that if nothing was found he would be free to leave, was handcuffed for

5    only two to three minutes to protect the officer and prevent flight, and the handcuffs were

6    removed in the security office.  *Id.*; *see also United States v Hernandez*, 693 F.2d 971,

7    978 (9th Cir. 1982) (concluding that border detainees were not arrested when they were

8    removed from their van, handcuffed, and escorted to a secondary security office where

9    the handcuffs were removed and the detainees were required to wait on a bench while

10   officials searched the van); *United States v. Zaragoza*, 295 F.3d 1025, 1028 (9th Cir.

11   2002) (concluding that a border detainee was not arrested when the detainee was asked to

12   leave his truck, handcuffed, told the handcuffs would be removed in the security office,

13   told he was not under arrest and that he would be detained until his truck was searched,

14   was escorted to the security office, patted down, and left to wait while his truck was

15   searched).

16        In *United States v. Nava*, 363 F.3d 942, 946 (9th Cir. 2004), the Ninth Circuit held

17   that a border detainee was not arrested when he was asked to exit his vehicle, was briefly

18   handcuffed, was told that the handcuffing was for officer safety, the handcuffs were

19   removed once he reached a secondary waiting area, was patted down, and asked to wait

20   while his truck was searched.  *Id.*  The Ninth Circuit found that the only difference

21   between Nava's detention and the detentions in *Bravo* and *Zaragoza* were "that Nava was

22   not explicitly told the handcuffing was temporary (but was told instead that the

1    handcuffing was for safety reasons), he was not told he would be free to leave if nothing

2    was found in his truck, and Nava was required to wait a longer period of time than the

3    defendant in *Bravo*." *Id.* The Ninth Circuit found that these differences did not warrant a

4    different result and found that Nava was not under arrest or unreasonably detained at the

5    border. *Id.*

6        In *Darulis v. Clark*, No. 08CV2344 DMS (RBB), 2010 WL 962938, at *3 (S.D.

7    Cal. Mar. 16, 2010), the district court was asked to consider whether a border detainee

8    who was handcuffed—not just for the walk to the security office—but also for a ten to

9    fifteen minute wait in the office had been arrested or unreasonably detained. The court

10   found that this distinction did not warrant a different result. *Id.* The court found that the

11   detainee was not handcuffed to anything in the office, but was sitting or standing at the

12   counter unattended by any particular person. *Id.* The court found that "[u]nder these

13   circumstances, the Court cannot say that a reasonable, innocent person 'would believe

14   that he is being subjected to more than the temporary detention occasioned by border

15   crossing formalities.'" *Id.* (quoting *Bravo*, 295 F.3d at 1009) (internal quotation marks

16   omitted). The detainee in *Darulis* argued that his case was distinguishable from *Bravo*

17   and *Zaragoza* because unlike the defendants in those cases, he was not told that the

18   handcuffs were temporary, that the handcuffs would be removed once inside the security

19   office, or that he was not under arrest. *Id.* at *3. The district court found that this

20   argument had been raised in *Nava* and rejected by the Ninth Circuit. *Id.* (citing *Nava*,

21   363 F.3d at 945-46).

22

ORDER- 27

1    The detainee in *Darulis* also argued that *Bravo* and *Zaragoza* were distinguishable

2    because in his case "[t]here was no reasonable or articulable suspicion that Darulis

3    committed any crime." *Id.* The district court held that "[w]hether the officers had

4    suspicions, however, is not determinative. Rather, the relevant inquiry is whether the

5    officers were justified in handcuffing Plaintiff while they completed their inspection." *Id.*

6    In other words, "the level of intrusion and aggressive police conduct must be a reasonable

7    response to the investigating officer's legitimate concerns." *United States v. Nelson*, No.

8    CR11-01364-TUC-JGZ(HCE), 2012 WL 827582, at *4 (D. Ariz. Mar. 12, 2012) (citing

9    *Guzman-Padilla*, 573 F.3d at 884).

10    In this case, Officer Andrews testified that he attempted to advise Dr. Czarnecki

11    that he was being handcuffed for safety reasons, but was interrupted by the scuffle that

12    ensued when Dr. Czarnecki turned from facing the wall in contravention to the CBP

13    Officers' instructions. (Andrews Dep. at 18:2-6.) Whether Dr. Czarnecki heard Officer

14    Andrews's statement concerning the reasons for the handcuffing or not, officer safety and

15    the safety of others are legitimate reasons for an officer to deploy handcuffs during a

16    border detention, and, if used in "reasonable response to legitimate safety concerns on the

17    part of investigating officers," the use of handcuffs does not convert an investigatory stop

18    into an arrest. *United States v. Miles*, 247 F.3d 1009, 1113 (9th Cir. 2001); *see also*

19    *Alexander v. Cty. of L.A.*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("It is well settled that when

20    an officer believes force is necessary to protect his [or her] own safety or the safety of the

21    public, measures to restrain individuals, such as . . . handcuffing them, are reasonable.");

22    *Guzman-Padilla*, 573 F.3d at 884 ("[O]fficers with a particularized basis to believe that a

1  situation may pose safety risks may handcuff . . . an individual without converting an

2  investigative detention into an arrest."); *United States v. Buffington*, 815 F.2d 1292, 1300

3  (9th Cir. 1987) ("The use of force during a stop does not convert the stop into an arrest if

4  it occurs under circumstances justifying fears for personal safety.").

5      Here, at the time of the Dr. Czarnecki's detention, CBP Officers had reason to be

6  concerned about their personal safety, the safety of Dr. Czarnecki, and Dr. Czarnecki's

7  possible flight risk.  (*See* US Resp. Ex. A ("Andrews Dep.") at 15:12-16 ("[W]e place

8  handcuffs to detain the person for officer safety and safety of themselves and flight

9  risk.").)  Officer Andrews testified about the safety and flight risks that are present when

10  a passenger is detained and awaiting another law enforcement agency to respond to a

11  potential criminal matter:

12         So in certain circumstances you wouldn't want to notify the person for the
          fact that they could . . . become upset or maybe [sic] a flight risk or
13         something like that.  So we just try to separate people and then detain them,
          and then we notify them of what's going on.
14
15  (*Id.* at 10:24-11:3.)  In addition, CBP Officers were detaining Dr. Czarnecki for purposes

16  of investigating a protection order entered against him that prohibited offensive contact

17  such as "assaulting, threatening, abusing, harassing, following, interfering, or stalking the

18  protected person."  (Cartwright Decl. Ex. 1 at USA 000338 (capitalization omitted); US

19  Mot. Ex. A at 3 (capitalization omitted).)  The court finds that the nature of the

20  investigation also supported handcuffing in this instance for officer safety.  Further, Dr.

21  Czarnecki was detained in a room with an emergency exit directly next to it, and CBP

22  Officer Willard testified that the doors on this room are typically kept open.  (*Id*. Ex. D

1  ("Willard Dep.") at 25:2-20.)   CBP Officer Willard also testified that concerns about

2  flight to the emergency exit may also factor into a decision to handcuff a detainee.  (*See*

3  *id.*)

4         Based on the foregoing circumstances, the court concludes that the CBP Officers'

5  decision to apply handcuffs to Dr. Czarnecki, prior to advising him of the reasons for his

6  detention, was reasonable to protect officer safety, Dr. Czarnecki's safety, and to prevent

7  flight risk.  The court concludes that in this instance the CBP Officers' use of handcuffs

8  was in "reasonable response to legitimate safety concerns on the part of investigating

9  officers" and did not convert Dr. Czarnecki's border detention into an arrest.  *See United*

10 *States v. Miles*, 247 F.3d 1009, 1113 (9th Cir. 2001).

11        **4.   The Length of Time Dr. Czarnecki Spent in Handcuffs Was Reasonable
              and Did Not Convert His Detention into an Arrest**

12        Dr. Czarnecki also argues that his detention was transformed into an arrest as a

13 result of (1) the length of time he remained in handcuffs, and (2) the fact that he was

14 handcuffed after he moved to a secure room rather than while the CBP Officers were

15 moving him there.  (*See* Pltf. Mot. at 14 ("The brief use of handcuffs to transport an

16 individual safely to a separate room is qualitatively different from forcibly placing a

17 person in handcuffs who is being held in a separate room for an indefinite period of

18 time.").)  There is no dispute that the total length of Dr. Czarnecki's detention—from the

19 moment he was referred to secondary inspection until officers removed his handcuffs—

20 was one hour and that Dr. Czarnecki remained in handcuffs for less than an hour while

21 waiting for POSP to arrive and complete their investigation into the protective order.

22

1    (*See* US Mot. at Ex. A at 8, 12, 14; Pltf. Mot. at 7 ("Dr. Czarnecki remained handcuffed

2    . . . for almost an hour . . . ."); Stead Dep. at 104:25-105:5.)  In *Darulis*, 2010 WL

3    962938, at *3, the court found that a 10 to 15 minute wait in handcuffs in a security office

4    did not convert a border detention into an arrest.

5         Contrary to Dr. Czarnecki's argument, several courts have found that it is lawful

6    to handcuff a detainee during an entire investigation or search at the border—not just at

7    the beginning or while the detainee is being transported to an office—depending on the

8    totality of the circumstances.  For example, in *Darulis*, the court did not find that the

9    plaintiff had suffered an arrest despite remaining handcuffed, not just for the walk to the

10   security office, but for an additional 10 to 15 minute wait in the office while agents

11   completed their inspection.  2010 WL 962938, at *3.  In *United States v. Nelson*, No. CR

12   11-01364-TUC-JGZ (HCE), 2012 WL 827582, at *4 (D. Ariz. Mar. 12, 2012), the court

13   found that a one hour detention while agents searched the detainee's vehicle did not rise

14   to the level of an arrest, even if the detainee was handcuffed during his detention.  In

15   *Nelson*, the detainee was transported in the back of an agent's vehicle from the scene of a

16   vehicle stop and placed in a detention cell for 30 to 45 minutes.  *Id.*  The agent did not

17   recall if the detainee was ever placed in handcuffs, but the district court stated that "the

18   absence of these facts" would not alter the court's conclusion that the detainee had not

19   been arrested.  *See id.* at *4 n.5 (citing *Nava*, 363 F.3d at 943, 946).  Similarly, in *United*

20   *States v. Carlill*, No. CR15-1161-TUC-CKJ(JR), 2015 WL 9855458, at *5 (D. Ariz. Dec.

21   18, 2015), *report and recommendation adopted*, 2016 WL 233164 (D. Ariz. Jan. 20,

22   2016), the court found that placing a detainee in a holding area while agents searched his

1   trailer did not rise to the level of an arrest or violate the Fourth Amendment, even if the

2   detainee was handcuffed during his detention.  *Id.* (citing *Bravo*, 295 F.3d at 1006) ("This

3   is so even if he was handcuffed.").  Based on these authorities, the court concludes that

4   Dr. Czarnecki's handcuffing for a portion of the hour that he was detained did not, based

5   on the totality of the circumstances here, transform his border detention into an arrest.

6   ### 5.   Dr. Czarnecki's Failure to Comply with CBP Officers' Request Provides Additional Justification for His Handcuffing

7        The CBP Officers had additional justification for maintaining handcuffs on Dr.

8   Czarnecki throughout the POSP's investigation—Dr. Czarnecki's failure to comply with

9   their request to face the wall.  Although Dr. Czarnecki initially complied with the CBP

10  Officers' request to face the wall (US Mot. Ex. A at 8, 14; Cartwright Decl. Ex. 5;

11  Fukuda Dep. at 32:5-13), it is undisputed that Dr. Czarnecki turned back toward the CBP

12  Officers while CBP Officer Andrews was attempting to handcuff him (*see* Pltf. Mot. at 6

13  n.2 (quoting Cartwright Decl. Ex. 2)).  CBP Officers stated in their reports that Dr.

14  Czarnecki "attempted to turn around" or "turned to face" the Officers.  (US Mot. Ex. A at

15  8, 14.)  Dr. Czarnecki does not dispute this account, but rather states that he

16  "predominantly" moved his head and cannot say "how much of [his] body turned at the

17  time."  Czarnecki Dep. at 29:21-30:5.  He acknowledges, however, that his "head was for

18  sure turned around."  *Id.*  Viewing the evidence in the light most favorable to Dr.

19  Czarnecki, there is no dispute that, although he initially complied, he ultimately defied

20  the CBP Officers' instructions to face the wall.

21

22

1    Dr. Czarnecki's actions in contravention to the CBP's Officers request to face the

2  wall, when coupled with the border crossing context, provides additional justification for

3  keeping Dr. Czarnecki in handcuffs until POSP had completed their investigation of the

4  protection order. *See Darulis*, 2010 WL 962938, at *3.  In *Darulis*, the officers asked the

5  plaintiff to sit on his motorcycle while they conducted their secondary inspection.  *Id.*  He

6  refused, and the officers handcuffed him and escorted him to a security room, where he

7  remained handcuffed while the officers completed their inspection.  The court concluded

8  that the plaintiff's defiance of the officer's request, "coupled with the border-crossing

9  context, was sufficient to warrant the handcuffs."  *Id.*; *see also United States v. Steel*, 486

10  F. App'x 690, 690-91 (9th Cir. 2012) (unpublished) (concluding that the officer's use of

11  handcuffs was justified and did not convert a *Terry* stop into an arrest where the suspect

12  did not comply with the officer's commands and made a movement with his right elbow

13  towards his right side which made the officer concerned that suspect was either carrying a

14  firearm or attempting to discard contraband).  The same is true here.  The CBP Officers

15  had reason to believe that Dr. Czarnecki posed a safety risk to them and the public as

16  soon as he disobeyed their commands and turned away from the wall.

17    Under the totality of the circumstances presented here, the court concludes that Dr.

18  Czarnecki's detention at the border did not rise to the level of an arrest, he was not

19  arrested when the CBP Officers decided to place him in handcuffs, and his detention by

20  the CBP Officers was reasonable.  Accordingly, the court DENIES Dr. Czarnecki's

21  motion for partial summary judgment and GRANTS the Government's motion for

22  summary judgment on Dr. Czarnecki's claim for false arrest.

**B.  Dr. Czarnecki's Claim for Assault and Battery**

Dr. Czarnecki seeks summary judgment that the CBP Officers committed the tort of battery by forcibly handcuffing him.  (Pltf. Mot. at 10.)  The Government seeks summary judgment that the CBP Officers' use of force was reasonable.  (US Mot. at 15-16.)

Under Washington law, "a police officer making an arrest is justified in using sufficient force to subdue a prisoner." *Boyles. City of Kennewick*, 813 P.2d 178, 179 (Wash. Ct. App. 1991).  However, an officer "becomes a tortfeasor and is liable as such for assault and battery if unnecessary violence or excessive force is used in accomplishing the arrest." *Id.*  Washington applies a "test of reasonableness" and instructs courts to consider the "(1) severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers and others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade by flight." *Staats v. Brown*, 991 P.2d 615, 625 (Wash. 2000) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  However, the court's consideration of reasonableness is not necessarily limited to these three factors.  Rather, "[w]hen . . . an officer is called upon to answer for . . . excessive force . . . he has the right to show the circumstances surrounding the transaction, and the impression these circumstances make on his mind, and to have the jury charged on his theory of the case; unless, of course, the circumstances were such that there could be no two opinions concerning it." *Coldeen v. Reid*, 182 P. 599, 601-02 (Wash. 1919).

First, the court considers the severity of the crime at issue.  *See Staats*, 991 P.2d at 625.  The CBP Officers did not use any force until Dr. Czarnecki disobeyed their

1    command to face the wall.[4]  Dr. Czarnecki does not deny that he turned in contravention

2    of the CBP Officers' directive to him.  (Pltf. Mot. at 6 n.2 ("[I]t is undisputed that Dr.

3    Czarnecki turned 'while officers were attempting to handcuff' him.") (quoting Cartwright

4    Decl. Ex. 2); Czarnecki Dep. at 29:21-30:5.)  The Government submits the report of a

5    police expert who opines that "[o]nce [Dr. Czarnecki] started turning towards Officers

6    Fukuda and Andrews . . . a reasonable officer would believe that he was going to resist

7    being placed into handcuffs."  (*See* US Mot. Ex. F at 3.)  Dr. Czarnecki has presented no

8    expert testimony in contravention; and thus, the Government's expert's opinion on this

9    point stands unrebutted.[5]  Resisting an officer while he or she is engaged in the

10

11    [4] Dr. Czarnecki argues that this is not true because the use of handcuffs themselves is a
     use of force and the CBP Officers began to handcuff him before he turned his head.  (Pltf. Resp.

12    at 17.)  The court, however, has already found that the CBP Officers' use of handcuffs was
     reasonable under the circumstances.  (*See supra* § III.C.3.)

13

14    [5] Dr. Czarnecki objects to the police expert's opinions.  (Pltf. Reply at 7-8.)  The "trial
     judge must ensure that any and all scientific testimony [or any other expert testimony] or
     evidence admitted is not only relevant, but reliable."  *Daubert v. Merrill Dow Pharm., Inc.*, 509

15    U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999)
     (extending *Daubert*'s requirements of relevance and reliability to non-scientific testimony).  That

16    said, "a trial court not only has broad latitude in determining whether an expert's testimony is
     reliable, but also in deciding how to determine the testimony's reliability."  *Hangarter v.
     Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal citations

17    omitted).

18         Dr. Czarnecki objects that the police expert's opinion encroaches on "an ultimate issue
     for this [c]ourt to decide as the trier of fact."  (Pltf. Reply at 7.)  The Ninth Circuit, however, has
     repeatedly found expert testimony on police practices and the use of force to be admissible in

19    cases involving allegations of police misconduct.  *See, e.g.*, *Smith v. City of Hemet*, 394 F.3d
     689, 703 (9th Cir. 2005) (en banc); *Davis v. Mason Cty.*, 927 F.2d 1473, 1484-85 (9th Cir. 1991)

20    (superseded by statute on other grounds); *Larez v. City of L.A*, 946 F.2d 630, 635, 647 (9th Cir.
     1991).  In *Davis*, the Ninth Circuit found that the testimony of the police practices expert was

21    properly received, noting that Federal Rule of Evidence 702 permits expert testimony comparing
     the conduct of the parties to the industry standard, and that Rule 704 allows an expert witness to
     express an opinion on an ultimate issue to be decided by the jury.  927 F.2d at 1484-85.  Further,

22    Dr. Czarnecki's concerns about encroaching on the province of the trier of fact are particularly

1  performance of his or her official duties is a violation of 18 U.S.C. § 111.  A violation of

2  this provision "while not severe, is not minor."  *Gomez v. Lozano*, 839 F. Supp. 2d 1309,

3  1318 (S.D. Fla. 2012).

4       The second factor relates to officer safety.  *See Staats*, 991 P.2d at 625.  The court

5  has already determined that the CBP Officers had reason to be concerned about their

6  safety.  (*See supra* § III.C.3.)  Further, the CBP Officers' concern for their safety

7  reasonably increased when Dr. Czarnecki acted in contravention to their directions to

8  face the wall.  (*See supra* § III.C.5.)

9

10

11  insubstantial here because in an FTCA case the court is the "trier of fact" and there is no jury.
   *See* 28 U.S.C. § 2402.  The court, therefore, overrules Dr. Czarnecki's objection on grounds that
12  the expert's opinion will invade the province of the trier of fact.
       Dr. Czarnecki also objects that the police expert's opinion is "conclusory" and not "based
13  on sufficient facts and data."  (Pltf. Reply at 8 (citing Fed. R. Evid. 702(b)).)  Rule 702(b) states
   that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or
14  education may testify in the form of an opinion or otherwise if . . . the testimony is based on
   sufficient facts or data."  Fed. R. Evid. 702.  The Government's police expert did not offer his
15  opinions in a vacuum, but rather based his opinions on his "training, experience[,] and the
   documents [he] reviewed regarding the incident."  (US Mot. Ex. F at 3.)  His experience and
16  training are extensive.  He is a Sergeant in the advanced training unit of the Seattle Police
   Department ("SPD") and has been a police officer for over 25 years.  (*Id.* at 1.)  He has extensive
17  law enforcement training in use of force and handcuffing techniques.  (*Id.*)  He is a certified
   police instructor with over 4,000 hours of police training.  (*Id.*)  His experience includes
18  "controlling subjects who are about to be handcuffed, handcuffing subjects in the standing
   position, supervising officers who place people into handcuffs and reviewing incidents . . . where
19  force was used to complete the handcuffing process."  (*Id.* at 2.)  Since 2011, he has reviewed
   over 1,000 use of force cases for the SPD as a part of his duties.  (*Id.*)  Further, in order to write
20  his report and prepare for this case, he reviewed Dr. Czarnecki's complaint; the claim Dr.
   Czarnecki filed with the CBP; written discovery produced by Dr. Czarnecki; reports of the
21  officers involved in the incident, among other documents; the depositions of CBP Officers
   Andrews, Stead, Fukuda, and Willard; and the deposition of Dr. Czarnecki.  (*Id.* at 2-3.)
22  Because the Government's expert expressly bases his opinions on his extensive training and
   experience and upon his review of documents concerning the incident, the court denies Dr.
   Czarnecki's objection that the expert's opinion is "conclusory" and not based on sufficient facts.

1    The third factor is whether Dr. Czarnecki was actively resisting.  *See Staats*, 991

2    P.2d at 625.  Dr. Czarnecki has testified that at first he turned away from the wall in

3    contravention to the CBP Officers' instructions only because he did not understand what

4    they were doing when they began to handcuff him.  (*See* Czarnecki Dep. at 21:9-21.)

5    Once he and the CBP Officers ended up on the floor, Dr. Carnecki testifies that he was

6    not resisting but could not comply with the CBP Officers' commands because his hand

7    was trapped under his body.  (*See id.* at 31:18-33:13; 36:20-24.)

8    Nevertheless, "[t]he reasonableness of a particular use of force must be judged

9    from the perspective of a reasonable officer on the scene."  *Gallegos v. Freeman*, 291

10   P.3d 265, 275 (Wash. Ct. App. 2013) (internal quotations omitted) (quoting *Graham v.*

11   *Connor*, 490 U.S. 386, 397 (1989)).[6]  Thus, even if, as Dr. Czarnecki contends, he was

12   not actually resisting the Officers' attempts to handcuff him either because he was

13   confused or because he was unable to comply with their directives, the question the court

14   must resolve is what the Officers on the scene reasonably believed was happening.  *See*

15   *Arnold*, 2012 WL 90472, at *6 (ruling that plaintiff's argument he did not intend to harm

16   _____

17   [6] The court recognizes that the *Gallegos* court was applying "the perspective of a
     reasonable officer on the scene" in the context of an excessive force claim under the Fourth

18   Amendment and not in the context of an assault and battery claim under state law.  *See Gallegos*,
     291 P.3d at 275.  However, in subsequently considering an assault claim, the *Gallegos* court

19   found that because it had already determined the officer's use of force was reasonable under
     the Fourth Amendment, the officer was also entitled to state law qualified immunity on the claim

20   for assault.  *Id.* at 277-78.  Thus, effectively, the *Gallegos* court evaluated the reasonableness of
     the officer's use of force in the context of the assault and battery claim from the perspective of a

21   reasonable officer on the scene.  *See also Arnold v. City of Lakewood*, No. 3:10-cv-05907 RBL,
     2012 WL 90472, at *7 (W.D. Wash. Jan. 11, 2012) (holding that state qualified immunity applies

22   to claim of assault and battery where the officer's use of force was reasonable under the Fourth
     Amendment) (citing  *McKinney v. City of Tukwila*,13 P.3d 631 (408-09) (Wash. Ct. App. 2000).

1  officers is irrelevant because the question is whether the officer on the scene reasonably

2  believed he was a threat); *Gomez v. Lozano*, 839 F. Supp. 2d 1309, 1318 (S.D. Fla. Mar.

3  13, 2012) ("And though I understand that Mr. Gomez maintains that he struggled only

4  because (1) he did not know who grabbed his arm and (2) the police officers were

5  suffocating him, Officer Blanco could certainly believe otherwise.").  The consistent

6  view of CBP Officers at the scene was that Dr. Czarnecki was resisting their attempts to

7  place him in handcuffs (US Mot. Ex. A at 7-8, 11-15), and the conclusions of the

8  Government's police expert supports the reasonableness of the Officers' view (*see id.* Ex.

9  F at 3).

10       Taking the foregoing facts and circumstances into account, the court then assesses

11  the reasonableness of the force the Officers used.  *Staats*, 991 P.2d at 625; *Coldeen*, 182

12  P. at 601-02.  The Government's expert on police practices opines that once the CBP

13  Officers reasonably perceived that Dr. Czarnecki was resisting the handcuffing

14  procedure, they had two options to gain control:  (1) they could use the wall as a surface

15  against which to control him and attempt to complete the handcuffing in a standing

16  position using bodily force and control positions, or (2) they could elect to take Dr.

17  Czarnecki to the ground using a takedown technique and place him in a prone position

18  for handcuffing.  (US Mot. Ex. F at 4.)  The expert opines that "a reasonable officer

19  would agree that either position was reasonable given the totality of the circumstances at

20  that time."  (*Id.*)

21       A review of the CBP Officers' reports and depositions reveals that they attempted

22  to control Dr. Czarnecki in a standing position and then either fell to the ground or took

1   Dr. Czarnecki to the ground.  (*See id.*); *see supra* § II.  Once on the ground, the CBP

2   Officers who responded used bodily force to control Dr. Czarnecki's arms and legs and

3   place him in handcuffs.  (US Mot. Ex. F at 4); *see supra* § II.  In addition, Officer Fukuda

4   applied a pressure point control technique that was ineffective.  (US Mot. Exs. A at 8, F

5   at 4.)  The Government's expert witness opines that the Officers' tactics and force

6   techniques were reasonable given the totality of the circumstances.  (US Mot. Ex. F at 4.)

7   He notes that bodily force and pressure point tactics are "some of the least intrusive force

8   options an officer can use in an attempt to control a resistant subject."  (*Id.*)  Dr.

9   Czarnecki has failed to come forward with any expert testimony to refute the

10  Government's expert's findings.

11        Given the foregoing evidence, there is no doubt that Dr. Czarnecki is not entitled

12  to summary judgment on his claim for assault and battery.  The more difficult question is

13  whether the Government is entitled to summary judgment in its favor on this claim.

14  Despite the foregoing showing and the unrebutted police expert opinion in the

15  Government's favor, the court concludes that the Government is also not entitled to

16  summary judgment.  In response to the Government's motion, Dr. Czarnecki submitted

17  expert reports from two doctors indicating that he sustained serious injuries caused by his

18  encounter with the CBP Officers.  (*See* 2d Cartwright Decl. (Dkt. # 36) Exs. 2-3.)  One of

19  Dr. Czarnecki's doctors stated that an injury to Dr. Czarnecki's shoulder "does not occur

20  without an enormous amount of force being brought to bear on the joint."  (*Id.* Ex. 2 at 2.)

21  The Government provides no response to this medical evidence.  (*See generally* US

22  Reply.)

ORDER- 39

1    In *LaLonde v. County of Riverside*, 204 F.3d 947, 952 (9th Cir. 2000), the plaintiff

2    admitted to resisting arrest and "getting into a scuffle" with defendant police officer.  The

3    plaintiff testified that his resistance ceased once the defendant officer sprayed him with

4    pepper spray.  *Id.*  At that point, another officer handcuffed the plaintiff while forcefully

5    putting his knees in plaintiff's back, causing the plaintiff significant pain that continued

6    until trial.  *Id.* at 952-53.  The officers then let the plaintiff sit on his couch while they

7    awaited backup and searched his home, but left the plaintiff in handcuffs.  *Id.* at 952.  The

8    *LaLonde* court held that a reasonable jury could determine that the injury to the plaintiff's

9    back constituted excessive force, despite the plaintiff's admitted resistance.  *Id.* at 959.

10   The court noted "if the extent of the injury to [the plaintiff's] back is serious enough, a

11   jury could conclude that [the defendant officer] used force in excess of what was

12   reasonable, even if [the plaintiff] had been resisting at the time."  *Id.*

13   "The *LaLonde* case compels the court to deny summary judgment" to the

14   Government on Dr. Czarnecki's battery claim.  *See Rice v. Murakami*, 73 F. Supp. 3d

15   1274, 1284 (D. Idaho 2014).  The facts are too similar to ignore.  Dr. Czarnecki has

16   submitted evidence of serious injuries that his doctors have linked to his encounter with

17   the CBP Officers.  (*See* 2d Cartwright Decl. Exs. 2-3.)  The Ninth Circuit has held that a

18   reasonable jury could rely on this type of evidence to conclude that an officer used force

19   in excess of what was reasonable.  *LaLonde*, 204 F.3d at 959.  Here, of course, there will

20   be no jury because the court serves as the trier of fact in an FTCA case, *see* 28 U.S.C.

21   § 2402, but this does not change the result on summary judgment.  Accordingly, the court

22   must deny the Government's motion for summary judgment on Dr. Czarnecki's claim for

1   assault and battery.  Because the court denies both Dr. Czarnecki's and the Government's

2   motions for summary judgment, the parties will proceed to trial solely on this claim.

3                              **IV.    CONCLUSION**

4          Based on the foregoing analysis, the court DENIES Dr. Czarnecki's motion for

5   partial summary judgment (Dkt. # 30) and GRANTS in part and DENIES in part the

6   Government's motion for summary judgment (Dkt. # 33).  Specifically, the court

7   GRANTS summary judgment to the Government on Dr. Czarnecki's claim for false

8   arrest and DENIES summary judgment to the Government on Dr. Czarnecki's claim for

9   assault and battery.

10         Dated this 26th day of September, 2016.

11

12

13                                        _____

14                                        JAMES L. ROBART
                                          United States District Judge

15

16

17

18

19

20

21

22

ORDER- 41