UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK CZARNECKI,

               Plaintiff,

    v.

UNITED STATES OF AMERICA,

               Defendant.

CASE NO. C15-0421JLR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

## I.      INTRODUCTION

The court conducted a bench trial on Plaintiff Mark Czarnecki's assault and battery claim on October 20, 21, and 28, 2016.[1]  (*See* Min. Entries (Dkt. ## 62-63, 65.) Dr. Czarnecki was represented at trial by Timothy K. Ford and Tiffany Mae Cartwright

---

[1] On September 27, 2016, the court entered an order granting in part and denying in part Defendant United States of America's ("the Government") motion for summary judgment.  (SJ Order (Dkt. # 50).)  The court granted summary judgment to the Government on Dr. Czarnecki's claim for false arrest, but denied summary judgment on his claim for assault and battery.  (*See generally id.*)  Accordingly, the parties proceeded to trial solely on Dr. Czarnecki's claim for assault and battery.  (*See id.* at 40.)  On October 17, 2016, the court also denied Dr. Czarnecki's motion for reconsideration of its order on granting summary judgment to the Government on Dr. Czarnecki's claim for false arrest.  (10/17/16 Order (Dkt. # 61).)

of MacDonald Hoague & Bayless.  The Government was represented by Kristin Berger

Johnson of the United States Attorney's Office in Seattle, Washington.  The court

considered the testimony of witnesses that the parties presented at trial, deposition

testimony of witnesses that the parties submitted to the court, the exhibits that the court

admitted into evidence, and the arguments of counsel.  In addition, the parties submitted

trial briefs (US Tr. Br. (Dkt. # 57); Plf. Tr. Br. (Dkt. # 58)) and proposed findings of fact

and conclusions of law (US Prop. F&C (Dkt. # 55); Plf. Prop. F&C (Dkt. # 56); Plf. Am.

Prop. F&C (Dkt. # 66)).  The court has weighed the testimony, exhibits, and other

evidence using the required "preponderance of the evidence" standard.[2]  Being fully

advised, the court makes the following findings of fact and conclusions of law.[3]

## II.    FINDINGS OF FACT

**A.    The Parties**

1.      Dr. Czarnecki is a resident of the state of Oregon, who resides in The

Dalles.  He is a retired family practice and sports medicine physician.  At the time of the

April 1, 2012, incident at issue, he was 60 years old and married to Virginia Czarnecki.

He is presently married to Kathleen Czarnecki.

2.      The Government is the only named defendant in this action, which Dr.

Czarnecki brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b),

---

[2] *See In re Mumford*, No. ADV 10-01078-KAO, 2011 WL 219674, at *2 (W.D. Wash. Jan. 24, 2011) (concluding with respect to the plaintiff's battery claim that "[t]he burden of proof is on the plaintiff, and the law requires proof by a preponderance of the evidence")

[3] To the extent any finding of fact may be more properly considered a conclusion of law, it shall also be considered a conclusion.  Similarly, to the extent any conclusion of law may be more properly considered a finding of fact, it shall also be considered a finding.  *See In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).

2671.  The Government is a party under the FTCA due to the involvement of several United States Custom and Border Control ("CBP") officers, who were acting in their official capacities at the time of the incident.

**B.      Credibility Determinations**

The court makes the following findings regarding credibility and the weight it gives to the testimony of certain witnesses:

3.      The court's decision following trial turns largely on the credibility of the various witnesses because the parties and witnesses presented different or contradictory versions of the April 1, 2012, incident at issue.

4.      The court finds the Government's version of the April 1, 2012, incident at issue, which is based on the testimony of several CBP officers, to be largely credible and Dr. Czarnecki's version of the April 1, 2012, incident to be largely not credible.

5.      Among the factors that persuade the court that the testimony of the Government's CBP Officers is more credible that Dr. Czarnecki's  testimony are the following:

a.      Each CBP officer's description of the incident is largely internally consistent regarding the details of the April 1, 2012, incident.  Further, the testimonies of the various CBP officers concerning the incident are largely consistent with each other. Yet, the testimonies of the CBP officers are not so well-matched as to suggest that the CBP officers are testifying from a unified script.

b.      Dr. Czarnecki's testimony, on the other hand, is rife with inconsistencies.  For example, he testified during his direct examination at trial that he

1   had never been a party to a lawsuit or any kind of legal action.  Yet, he admitted on cross

2   examination that he had been involved in at least two prior legal actions.  First, he was

3   charged with assault, fourth degree, domestic violence in an incident involving his first

4   wife, Virginia Czarnecki.  As a result of the charge, he entered into a plea agreement

5   involving a pretrial diversion program in which he agreed to attend domestic violence

6   classes.  Second, he admitted on cross examination that he had finalized his divorce from

7   Virginia Czarnecki during the preceding year.

8          c.     Dr. Czarnecki also testified during his direct examination at trial that

9   prior to April 1, 2012, incident his health was "essentially perfect."  However, on cross

10  examination, he admitted that his medical history included issues with hypertension,

11  anxiety, chronic back pain, prior fractures, nephrolithiasis, and persistent knee and back

12  problems.  In addition to these medical issues, he testified that his former wife, Virginia

13  Czarnecki, had previously split his head open and cracked his skull with a pewter turkey

14  platter and that he could still feel the crack in his skull at the time of trial.

15        d.     The most critical example of Dr. Czarnecki's inconsistencies,

16  however, is the varying descriptions of his own actions during the incident in question,

17  which the court discusses later in this order.  *See infra* § II.E, ¶¶ 48-52.

18        e.     Finally, Dr. Czarnecki's testimony at times bordered on or fell into

19  exaggeration or hyperbole.  For example, he testified at trial that at one point during his

20  April 1, 2012, altercation with CBP officers, he wondered whether the CBP officers were

21  trying to abduct or kill him.

22        f.     Thus, to the extent that Dr. Czarnecki's testimony conflicts with the

1  testimony of other witnesses concerning the events of April 1, 2012, the court generally

2  credits the testimony of the other witnesses rather than Dr. Czarnecki's testimony.

3  **C.    CBP**

4         6.     CBP operates the port of entry at the Seattle-Tacoma International Airport

5  ("SeaTac").

6         7.     CBP officers run various security, criminal, and background checks on all

7  passengers arriving at SeaTac.  If a CBP officer discovers relevant information

8  concerning a passenger during a background check, CBP officers may subject the

9  passenger to additional screening or inspection.

10 **D.    The Events of April 1, 2012**

11        8.     On April 1, 2012, Dr. Czarnecki was returning home from a vacation in

12 Mexico with his then-wife, Virginia Czarnecki, his daughter, Morgan Czarnecki, and one

13 of Morgan Czarnecki's friends.

14        9.     When a CBP officer ran a check on Dr. Czarnecki's passport, the officer

15 discovered a record of a protection order from Wasco County, Oregon.  The record

16 appeared to show that Dr. Czarnecki was the subject of the protection order and that his

17 wife and daughter were the persons protected under the order.

18        10.    Because Dr. Czarnecki was traveling with the persons who appeared to be

19 protected under the order, a CBP officer referred the family for additional screening.  The

20 court has already concluded on summary judgment that, under the totality of the

21 circumstances, the CBP officers' detention of Dr. Czarnecki at the border to permit

22 further investigation of the protection order was reasonable and did not rise to the level of

1    an arrest.  (*See* SJ Order at 15-33.)

2        11.    CBP Supervising Officer Joseph Stead assigned CBP Officer James Fukuda

3    to complete the family's inspection.  CBP Supervising Officer Stead also assigned CBP

4    Officer Michael Andrews to assist CBP Officer Fukuda.  CBP Supervising Officer Stead

5    authorized CBP Officers Fukuda and Andrews to conduct a pat-down of Dr. Czarnecki

6    and to handcuff and detain him until local law enforcement arrived to investigate the

7    protection order.

8        12.    After the family collected their luggage, CBP Officers Fukuda and

9    Andrews approached the family and escorted them to an area designated for secondary

10   screening and inspection.  The CBP officers separated Dr. Czarnecki from his family and

11   escorted him into one of the private rooms located immediately behind the inspection

12   station.

13       13.    CBP Officer Andrews conducted a pat-down search on Dr. Czarnecki,

14   including a shoe check.  CBP Officer Fukuda remained in the room and observed the pat-

15   down search.  Dr. Czarnecki complied with CBP Officer Andrews's instructions during

16   the pat-down search.

17       14.    Next, CBP Officer Andrews asked Dr. Czarnecki to face the wall and put

18   his hands behind his back.  CBP Officer Andrews asked Dr. Czarnecki to do this in

19   preparation for placing handcuffs on Dr. Czarnecki.  Dr. Czarnecki initially complied

20   with CBP Officer Andrews's request and faced the wall.

21       15.    CBP Officer Andrews then took out his handcuffs and began to say, "For

22   your and our safety . . . ."  During CBP Officer Andrews's statement, Dr. Czarnecki

ORDER - 6

1    suddenly pulled his hands in front of himself and turned around to face the two CBP

2    officers.  As Dr. Czarnecki did this, he asked, "What are you doing?"  Dr. Czarnecki

3    turned around to face the CBP officers in an aggressive manner.

4         16.    Due to Dr. Czarnecki's about face, CBP Officer Andrews was unable to

5    complete his sentence in which he was going to tell Dr. Czarnecki that for his safety and

6    the safety of the officers, he was about to place handcuffs on Dr. Czarnecki.  To the

7    extent the CBP officers' testimony on the initial events of Dr. Czarencki's handcuffing

8    conflicts with the testimony of Dr. Czarnecki, the court discounts Dr. Czarnecki's

9    testimony and credits the testimony of the CBP officers for the reasons stated above.  *See*

10   *supra* § II.B, ¶¶ 4-5.

11        17.    In order to control the situation, CBP Officers Fukuda and Andrews

12   attempted to turn Dr. Czarnecki back against the wall.  CBP Officer Fukuda issued the

13   command:  "Don't move."  Dr. Czarnecki did not comply with CBP Officer Fukuda's

14   command.  Dr. Czarnecki also resisted the CBP Officers' attempts to reposition him to

15   face the wall and continued to try to force his way around to face the CBP Officers.

16        18.    During the course of the struggle to reposition Dr. Czarnecki back toward

17   the wall, both CBP Officer Andrews and Dr. Czarnecki ended up on the floor.

18        19.    CBP Officer Fukuda pushed the alarm button in the room.

19        20.    CBP Officer Fukuda instructed Dr. Czarnecki to stop resisting, but Dr.

20   Czarnecki did not comply.  At some point during the struggle, CBP Officer Fukuda was

21   grabbed one of Dr. Czarnecki's arms and placed the arm behind Dr. Czarnecki's back.

22   At that point, CBP Officer Andrews successfully placed a handcuff on Dr. Czarnecki's

1    wrist.  However, Dr. Czarnecki's other arm remained under his body.

2        21.    Dr. Czarnecki continued to resist the CBP Officers by holding his arms

3    underneath his body, positioning himself on his stomach, and kicking his legs.  CBP

4    Officer Fukuda repeatedly ordered Dr. Czarnecki to give his hand to the officers.  Dr.

5    Czarnecki failed to comply and continued to resist.

6        22.    At some point during the struggle, CBP Officer Fukuda used his knuckle to

7    apply a pressure point compliance technique to an area in front of Dr. Czarnecki's right

8    ear.  CBP Officer Fukuda's use of the pressure point technique, however, proved

9    ineffective.  CBP Officer Fukuda applied the pressure point technique for less than five

10   seconds.

11       23.    Five CBP officers responded to the alarm triggered by CBP Officer

12   Fukuda, including:  CBP Supervising Officer Stead, and CBP Officers Amra Thomas,

13   Matthew Ruppert, Galvin Proffer, and Han Nguyen.

14       24.    When CBP Officer Ruppert arrived at the scene, the door to the room was

15   closed.  He opened the door and turned off the alarm.  He saw CBP Officers Fukuda and

16   Andrews on the ground struggling with Dr. Czarnecki.  Dr. Czarnecki was curled up on

17   his side and face down on the ground.

18       25.    CBP Officer Ruppert heard CBP Officers Fukuda and Andrews repeatedly

19   stating, "Let me see your hands," and saw the officers trying to handcuff Dr. Czarnecki.

20   Dr. Czarnecki was not complying with the CBP officers' commands.

21       26.    CBP Officer Ruppert attempted to assist CBP Officers Fukuda and

22   Andrews by grabbing Dr. Czarnecki's legs from underneath his body and straightening

1    them out so that Dr. Czarnecki was lying straight on the ground instead of curled up.  Dr.

2    Czarnecki continued to resist the CBP Officers.

3        27.    After CBP Officer Ruppert straightened out Dr. Czarnecki's legs, Officer

4    Thomas knelt down and grabbed Dr. Czarnecki's ankles.  CBP Officer Ruppert then

5    stood up and had no further physical contact with Dr. Czarnecki.

6        28.    When CBP Officer Thomas arrived on the scene, she saw multiple CBP

7    officers attempting to subdue Dr. Czarnecki, who was on his stomach on the floor and

8    actively resisting the CBP Officers' attempts to handcuff him.

9        29.    CBP Officer Thomas heard the other CBP officers telling Dr. Czarnecki

10   multiple times to give them his hands and to stop resisting.  She also observed Dr.

11   Czarnecki kicking and actively twisting to his side in an attempt to keep his hands away

12   from the CBP officers.

13       30.    CBP Officer Thomas knelt near Dr. Czarnecki and, even though he was

14   kicking her, grabbed both of his ankles.  CBP Officer Thomas then crossed Dr.

15   Czarnecki's ankles and folded his legs at the knees.  She applied her body weight to keep

16   Dr. Czarnecki's legs bent and still against his body.

17       31.    CBP Officer Thomas stopped applying pressure to Dr. Czarnecki's legs as

18   soon as the other CBP officers were able to complete handcuffing Dr. Czarnecki.  CBP

19   Officer Thomas had no further physical contact with Dr. Czarnecki.

20       32.    When CBP Officer Nguyen arrived at the scene in response to the alarm, he

21   saw other CBP officers trying to take control of Dr. Czarnecki, who was on the floor.

22       33.    CBP Officer Nguyen moved near CBP Officer Thomas in an attempt to

assist her in controlling one of Dr. Czarnecki's legs. CBP Officer Nguyen crouched near CBP Officer Thomas and used one hand to assist CBP Officer Thomas in holding Dr. Czarnecki's legs in place against his body. CBP Officer Nguyen did not lean any of his body weight on Dr. Czarnecki's legs or on any other part of Dr. Czarnecki's body.

34.     After Dr. Czarnecki was handcuffed, CBP Officer Nguyen removed his hand from Dr. Czarnecki's leg and had no further physical contact with Dr. Czarnecki.

35.     When CBP Officer Proffer arrived at the scene in response to the alarm, he saw Dr. Czarnecki on the floor laying on his stomach and resisting several CBP officers by trying to put his arms underneath his body. CBP Officer Proffer observed CBP Officers Fukuda and Andrews attempting to handcuff Dr. Czarnecki while Dr. Czarnecki resisted their efforts.

36.     CBP Officer Proffer heard several other CBP Officers repeatedly instructing Dr. Czarnecki to "stop resisting." CBP Officer Proffer also instructed Dr. Czarnecki to "stop resisting."

37.     CBP Officer Proffer knelt near Dr. Czarnecki and assisted the other CBP officers by placing his hands on Dr. Czarnecki's shoulder blades and applying just enough pressure to prevent Dr. Czarnecki from moving. CBP Officer Proffer placed his hands on Dr. Czarnecki's shoulder blades with his palms open. CBP Officer Proffer did not put any of his body weight on Dr. Czarnecki.

38.     CBP Officer Proffer kept his hands on Dr. Czarnecki's shoulder blades until the handcuffing was complete, and he had no further physical contact with Dr. Czarnecki.

39.     In response to the alarm, CBP Supervising Officer Stead came to the room where CBP Officers Fukuda and Andrews were attempting to handcuff Dr. Czarencki. CBP Supervising Officer Stead was positioned in the doorway and observed the actions of the other CBP Officers.

40.     CBP Supervising Officer Stead did not have any physical contact with Dr. Czarencki until after he was handcuffed and the struggle was over.

41.     When CBP Supervising Officer Stead arrived at the scene, he heard the other CBP officers repeatedly ordering Dr. Czarnecki to "stop resisting" and "put your hands behind your back."  He also saw that one of Dr. Czarnecki's hands was already in handcuffs and that CBP Officer Andrews was attempting to get into position to handcuff Dr. Czarnecki's other hand.  CBP Supervising Officer Stead observed that Dr. Czarnecki was resisting the CBP Officers by keeping his arms tense, attempting to keep his arms underneath his body, and by kicking wildly.

42.     CBP Supervising Officer Stead pointed at CBP Officer Fukuda and directed that only CBP Officer Fukuda should give the commands to Dr. Czarnecki.  CBP Officer Fukuda continued to give Dr. Czarnecki commands to stop resisting and to put his hands behind his back.  Dr. Czarnecki failed to follow these commands.  He continued to try to evade the CBP officers' attempts to place handcuffs on his other hand, and he continued to kick wildly.  Dr. Czarnecki kicked CBP Officer Thomas.

43.     Eventually, the CBP Officers were able to get both of Dr. Czarnecki's hands behind his back and into handcuffs.  Dr. Czaarnecki did not stop resisting until the handcuffs were in place.

44.     The physical altercation between the CBP Officers and Dr. Czarnecki lasted between two and five minutes.

45.     Once the handcuffs were in place and Dr. Czarnecki had stopped resisting, CBP Supervising Officer Stead assisted Dr. Czarnecki to his feet and sat him down on a padded seat.  Although Dr. Czarnecki was upset, after he was handcuffed, he cooperated with the CBP officers and no longer physically resisted them.

46.     CBP Officer Fukuda adjusted the fit on the handcuffs and activated the double lock.  CBP officers contacted the Port of Seattle ("POS") Police to investigate the protection order from Wasco County, Oregon.

47.     CBP Supervising Officer Stead asked Dr. Czarnecki if he was bleeding, if he was okay, and if he needed medical attention.  Each time, Dr. Czarnecki responded "no."  CBP officers offered but Dr. Czarnecki declined to receive any medical attention at the scene.

**E.     Dr. Czarnecki's Testimony Concerning His Altercation with CBP Officers**

48.     Dr. Czarnecki's testimony at trial concerning the foregoing events is both inconsistent with his prior deposition testimony and inconsistent with the testimony of all of the CBP officers who were in the room with him at the time.

49.     During his deposition, Dr. Czarnecki testified that although he could not recall how much of his body he turned toward the CBP Officers, he predominately turned his head.  (*See* Czarnecki Dep. (Dkt. # 27-2) at 29:23-30:5 ("Q: . . . So did you turn just your head or your body?  A:  I can't remember exactly.  I remember my head was for sure turned around.  How much of my body turned at that time, I can't tell you

1   exactly. . . . I predominantly turned my head to see what was going on.").)

2   50.   At trial, however, Dr. Czarnecki acknowledged that he "turned around" and

3   "turned [his] body" in contravention to CBP Officer Andrew's instruction.  Dr. Czarnecki

4   also testified that CBP Officer Andrews did not attempt to say anything to him

5   concerning safety prior to initiating the handcuffing procedure.

6   51.   Dr. Czarnecki testified at trial there was no way to fight back against the

7   CBP officers because they were all on top of him and he had nowhere to go.  He also

8   stated that he did not give his left arm to the CBP officers when they directed him to do

9   so because his arm was pinned underneath of his body and the CBP Officers could not

10   hear his statements to that effect over the sound of the multiple CBP officers who were

11   simultaneously giving him directions.

12   52.   To the extent that Dr. Czarnecki's testimony conflicts with the testimony of

13   the CBP Officers concerning the events of April 1, 2012, the court credits the testimony

14   of the CBP Officers and finds Dr. Czarnecki's testimony to be not credible for all of the

15   reasons stated above.  *See supra* § II.B, ¶¶ 4-5, § II.E, ¶¶ 48-51.

16   **F.    CBP Officers' Use of Force**

17   53.   Sergeant Thomas F. Ovens of the Seattle Police Department ("SPD")

18   testified on behalf of the Government as an expert witness in use of force police

19   practices.  Based on his educational background and his years of experience and training

20   in law enforcement and use of force police practices, the court finds that Sergeant Ovens

21   is qualified to testify as an expert witness in use of force police practices.

22

54.     The use of force options that are available to officers who seek to handcuff a subject when the subject is curled on the ground with his arms clenched under his chest and his legs folded into his chest include the use of pressure point techniques and bodily force, including the use of some leverage techniques.  These options are used to control the subject's wrists and arms and enable the officer to move the subject into an appropriate position for handcuffing.

55.     Attempting to handcuff a resisting subject who is on the ground poses risks of injury to the officers involved.  There are additional risks of injury to the officers if they are attempting to handcuff a resisting subject in a small, confined area.

56.     The pressure point technique used by CBP Officer Fukuda has a low risk of injury.

57.     In Sergeant Ovens's expert opinion, the actions of the CBP officers from the point they began handcuffing Dr. Czarnecki until he was handcuffed were consistent with reasonable police practices overall given the decision-making environment in which the CBP officers found themselves.

58.     Dr. Czarnecki did not provide any expert testimony in opposition to Sergeant Ovens's opinion.

**G.     Dr. Czarnecki's Release**

59.     When POS officers arrived at the scene to investigate the order of protection, they interviewed Dr. Czarnecki and his wife and daughter.  The POS officers also contacted the originating agency to verify that the protection order was valid and had been served.

1    60.    Following their investigation, the POS Officers concluded that the

2 protection order had been amended to prohibit only offensive contact, such as assaulting,

3 threatening, abusing, harassing, following, interfering, or stalking the protected persons.

4 The POS officers decided not to arrest Dr. Czarnecki.  They removed his handcuffs and

5 escorted him out of the inspection area.

6    61.    After his handcuffs were removed, the POS officers observed Dr.

7 Czarnecki rubbing his right shoulder and bending over in pain.  They asked Dr.

8 Czarnecki if he wanted to be seen by medical personnel, but he declined.

9    62.    The length of time between Dr. Czarnecki's initial detention by CBP

10 officers and his ultimate release by POS officers was approximately one hour.

11 **H.    Dr. Czarnecki's Injuries**

12    63.    On April 11, 2102, Dr. Czarenecki underwent surgery for an injury to

13 subscapularis tendon of his right shoulder.

14    64.    Both Dr. Czarnecki's orthopedic surgeon, Dr. Todd Ulmer, and the

15 Government's orthopedic expert witness, Dr. John Burns, agree that the injury to Dr.

16 Czarnecki's shoulder occurred as a result of Dr. Czarnecki's altercation with CBP

17 officers on April 1, 2012.

18    65.    The court finds that it is more probable than not that the injury to Dr.

19 Czarnecki's right shoulder occurred as result of Dr. Czarnecki's altercation with CBP

20 officers on April 1, 2012.

21    66.    On August 7, 2012, Dr. Czarnecki underwent surgery for an injury to his

22 left shoulder.  Following his April 1, 2012, altercation with CBP Officers, Dr. Czarnecki

did not complain to his doctors about any injury or pain in his left shoulder for an extended period of time.

67.   Dr. Burns does not believe that the injury to Dr. Czarnecki's left shoulder was caused by the April 1, 2012, incident because there is no record of Dr. Czarnecki experiencing any symptoms in his left shoulder for an extended period of time following the April 1, 2012, incident.

68.   Dr. Ulmer concludes that the injury to Dr. Czarnecki's left shoulder occurred as a result of Dr. Czarnecki's April 1, 2012, altercation with CBP Officers.  Dr. Ulmer's conclusion, however, is based predominantly on Dr. Czarnecki's self-reporting.

69.   The court has already discounted Dr. Czarnecki's credibility.  *See supra* § II.B, ¶¶ 4-5, § II.E, ¶¶ 48-52.  Dr. Ulmer did not discount Dr. Czarnecki's self-reporting. Because the court does discount Dr. Czarnecki's testimony, the court also discounts Dr. Ulmer's conclusion concerning the cause of  Dr. Czarnecki's shoulder injury.

70.   Accordingly, the court finds that Dr. Czarnecki has not proven by a preponderance of the evidence that his altercation with CBP officers on April 1, 2012, more probably than not caused the injury to his left shoulder.

71.   Dr. Czarnecki testified that CBP Officers placed pressure on his back during the altercation and that he felt like he could not breathe and was on the verge of losing consciousness.  Virginia Czarnecki also testified that Dr. Czarnecki looked like he was struggling to breathe during the car ride home from SeaTac after the April 1, 2012, incident.  Dr. Czarnecki, however, did not lose consciousness during the altercation. Further, he struggled with the CBP officers until they were able to secure handcuffs on

ORDER - 16

1  both of his wrists.  Dr. Czarnecki's continued ability to struggle with and resist the CBP

2  officers until he was handcuffed is inconsistent with his testimony that he was on the

3  verge of losing consciousness.  Further, the court has already discounted Dr. Czarnecki's

4  credibility.  *See supra* § II.B, ¶¶ 4-5, § II.E, ¶¶ 48-51.  Accordingly, the court does not

5  credit his testimony that he could not breathe and was on the verge of losing

6  consciousness during the April 1, 2012, altercation.

7        72.     In the months and years following the April 1, 2012, incident, Dr.

8  Czarencki began experiencing neurocognitive problems and memory loss.  Dr.

9  Czarnecki's treating psychiatrist, Dr. Robert George, testified that, in his opinion, Dr.

10  Czarnecki's neurocognitive deficits were caused by a brain injury that he incurred during

11  the April 12, 2012, incident as the result of hypoxia.

12        73.     In January 2015, Dr. James Bryan completed an independent

13  neuropsychological examination of Dr. Czarnecki at the request of Dr. Czarnecki's

14  disability insurer.  Dr. Bryan opined that, although the possibility of hypoxia sustained at

15  the time of the April 1, 2012, incident could not be ruled out, the possibility of an early

16  stage neurodegenerative process also could not be ruled out.

17        74.     Because the court does not credit Dr. Czarnecki's testimony that he could

18  not breathe and was on the verge of losing consciousness during the April 1, 2012,

19  incident, and because Dr. Bryan testifies that an early stage neurodegenerative process

20  cannot be ruled out as the cause of Dr. Czarnecki's neurocognitive deficits, the court

21  finds that Dr. Czarnecki has failed to establish that his neurocognitive deficits were more

22  probably than not caused by the April 1, 2012, incident.

75.     Following the April 1, 2012, incident, Dr. Czarnecki also continued to suffer from chronic depression.  The court finds that Dr. Czarnecki's chronic depression more likely than not was aggravated as a result of the April 1, 2012, incident.

76.     Following the April 1, 2012, incident, Dr. Czarnecki was treated for an injury to the right radial nerve in his right wrist.  The court finds that this injury was more probably than not caused as a result of the April 1, 2012, altercation.

77.     Following the April 1, 2012, incident, Dr. Czarnecki was treated for an injury to his right trigeminal nerve on the right side of his face.  The court finds that this injury was more probably than not caused as a result of the April 1, 2102, altercation.

## III.  CONCLUSIONS OF LAW

1.     Dr. Czarnecki brought this suit pursuant to the FTCA.  The court has jurisdiction under 28 U.S.C. § 1346(b), and venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1402 because the acts and omissions alleged in Dr. Czarnecki's amended complaint occurred in this district.  (*See generally* Am. Compl. (Dkt. # 10).)

2.     Pursuant to the FTCA, the Government is liable for a "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).

1    3.    The April 1, 2012, incident between Dr. Czarnecki and the CBP Officers

2    occurred in Washington and, therefore, the law to be applied is the substantive law of

3    Washington State.  *Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006).

4    4.    Pursuant to the FTCA, the Government is liable "in the same manner and to

5    the same extent as a private individual under like circumstances, but shall not be liable

6    for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.

7    5.    Dr. Czarnecki's amended complaint alleges claims for false arrest and for

8    assault and battery.  (*See generally* Am. Compl.)

9    6.    On September 27, 2016, the court granted summary judgment to the

10   Government on Dr. Czarnecki's claim for false arrest.  (*See* SJ Order at 15-33.)  The

11   court ruled that (a) the CBP Officers' detention of Dr. Czarnecki was supported by

12   reasonable suspicion; (b) the CBP Officers' decision to handcuff Dr. Czarnecki did not

13   convert his lawful detention into an arrest without probable cause; (c) the length of time

14   that Dr. Czarnecki spent in handcuffs was reasonable and did not convert his detention

15   into an arrest; and (d) Dr. Czarnecki's failure to comply with the CBP Officers'

16   command to face the wall provided additional justification for the handcuffing.  (*Id.*)

17   7.    Following in the court's grant of partial summary judgment to the

18   Government, the only claim that remained for trial was Dr. Czarnecki's claim for assault

19   and battery.  (*Id.* at 40.)

20   8.    Under Washington law, "a police officer making an arrest is justified in

21   using sufficient force to subdue a prisoner."  *Boyles v. City of Kennewick*, 813 P.2d 178,

22   179 (Wash. Ct. App. 1991).

9.     An officer "becomes a tortfeasor and is liable as such for assault and battery if unnecessary violence or excessive force is used in accomplishing the arrest." *Id.*

10.     Washington applies a "test of reasonableness" and instructs courts to consider the "(1) severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers and others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade by flight." *Staats v. Brown*, 991 P.2d 615, 625 (Wash. 2000) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

11.     However, the court's consideration of reasonableness is not limited to these three factors.  "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circumstances." *Hammer v. Gross*, 932 F.2d 842, 846 (9th Cir. 1991); *see also Coldeen v. Reid*, 182 P. 599, 601-02 (Wash. 1919) ("When . . . an officer is called upon to answer for . . . excessive use of force in making a lawful arrest, he has the right to show the circumstances surrounding the transaction, and the impression these circumstances make on his mind . . . .").

12.     The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene. *Gallegos v. Freeman*, 291 P.3d 265, 275 (Wash. Ct. App. 2013).

13.     The first factor—the severity of the crime—weighs in favor of reasonableness. *See Staats*, 991 P.2d at 625.  The CBP officers did not use any force until Dr. Czarnecki turned to face them.  The CBP officers reasonably believed that Dr.

1  Czarnecki was going to resist their efforts to place him in handcuffs when he turned his

2  body to face them in contravention of their instructions to face the wall.

3      14.    Resisting an officer while he or she is engaged in the performance of his or

4  her official duties is a violation of 18 U.S.C. § 111.  A violation of this provision "while

5  not severe, is not minor."  *Gomez v. Lozano*, 839 F. Supp. 2d 1309, 1318 (S.D. Fla.

6  2012).

7      15.    The CBP Officers did not deploy any weapons in response to Dr.

8  Czarnecki's resistance.  Rather, they used both physical force and a pressure point

9  technique in response to Dr. Czarnecki's resistance.  According to Sergeant Ovens, these

10 tactics constitute relatively low levels of police force.  The court, therefore, concludes

11 that the force the CBP Officers used during the April 1, 2012, incident was

12 commensurate with the severity of Dr. Czarnecki's violation.  Accordingly, the court also

13 concludes that the first factor—the severity of the crime—weighs in favor of finding that

14 the force used by the CBP officers in this instance was reasonable.

15     16.    The second factor—whether the suspect poses an immediate threat to the

16 safety of the officers—also weighs in favor of finding reasonableness.  *See Staats*, 991

17 P.2d at 625.  CBP Officers Andrews and Fukuda knew that Dr. Czarnecki was the subject

18 of a protection order.  They were detaining him for the purpose of allowing local law

19 enforcement to investigate the protection order.  Thus, CBP Officers Andrews and

20 Fukuda had a reasonable basis to be concerned about their safety and their safety

21 concerns reasonably increased when Dr. Czarnecki disobeyed their directive to face the

22 wall and instead turned toward them in an aggressive manner.

1    17.    The CBP officers who arrived at the scene in response to the alarm also had

2    a reasonable basis for being concerned about officer safety.  When they arrived, Dr.

3    Czarencki was on the ground, actively resisting CBP Officers Fukuda and Andrews, and

4    kicking his legs.  The close quarters of the small inspection room in which the CBP

5    officers were required to work to subdue Dr. Czarnecki also reasonably increased the

6    CBP officers' concern for their own safety.   Thus, the court concludes that the second

7    factor related to officer safety also weighs in favor of finding that the level of force used

8    by the CBP officers was reasonable.

9    18.    The third factor is whether Dr. Czarnecki was actively resisting.  *See*

10   *Staats*, 991 P.2d at 625.  The CBP officers reasonably believed that Dr. Czarnecki was

11   actively resisting their instructions and commands.  The CBP officers testified that they

12   only used the force necessary to allow them to bring Dr. Czarnecki's hands behind his

13   back and handcuff him despite his resistance.  Toward this end, the CBP officers used

14   bodily force and a pressure point technique, the latter of which proved ineffective on Dr.

15   Czarnecki.  Dr. Czarnecki continued to resist the CBP officers until they were able to

16   secure his hands in the handcuffs.

17   19.    Although Dr. Czarnecki claims that he was not resisting, the court finds that

18   his testimony on this point, among other points, is not credible.  *See supra* § II.B, ¶¶ 4-5,

19   § II.E, ¶¶ 48-52.

20   20.    The court concludes that the third factor—whether Dr. Czarnecki was

21   actively resisting—weighs in favor of concluding that the CBP Officers' use of force

22   during the April 1, 2012, incident was reasonable.

1      21.    Sergeant Ovens's testimony also weighs in favor of the court concluding

2   that the CBP officers' use of force was reasonable under all the circumstances.  Sergeant

3   Ovens testified that, in his expert opinion, the CBP officers' tactics and force techniques

4   were reasonable and necessary given the resistance described by the CBP officers and the

5   totality of the circumstances.  Sergeant Ovens testified that the bodily force and pressure

6   point control tactic used by the CBP officers are some of the least intrusive force options

7   an officer can use in an attempt to control a subject who is actively resisting.

8      22.    The Ninth Circuit has indicated that the trier of fact may determine, based

9   on the extent of a plaintiff's injuries, that the force an officer used was excessive despite

10   the fact that the plaintiff was resisting the officer at the time he or she was injured.  *See*

11   *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 952 (9th Cir. 2000) (noting that "if the extent

12   of the injury to [the plaintiff] . . . is serious enough, a jury could conclude that [the

13   defendant officer] used force in excess of what was reasonable, even if [the plaintiff] had

14   been resisting at the time").

15      23.    Neither the fact that Dr. Czarnecki incurred injuries as a result of his

16   altercation with CBP officers on April 1, 2012, nor the extent of his injuries that were

17   more probably than not caused by the altercation, alter the court's conclusion that the

18   CBP officers' use of force was reasonable.  The shoulder injury Dr. Czarnecki sustained

19   was caused in part by Dr. Czarencki's own efforts to keep his hands underneath his body

20   and to resist the CBP officers' efforts to pull his arms out from underneath his body.  The

21   injuries that Dr. Czarencki sustained were directly related to the CBP officers' attempts to

22

ORDER - 23

1    handcuff Dr. Czarnecki and do not establish that the CBP officers' use of force on April

2    1, 2012, was unreasonable given all the circumstances facing the CBP officers.

3           24.    Dr. Czarnecki has failed to establish by a preponderance of the evidence

4    that the CBP officers' use of force on April 1, 2012, was unreasonable or excessive.

5    Accordingly, the court concludes that Dr. Czarencki has failed to establish by a

6    preponderance of the evidence his FTCA claim against the Government for assault and

7    battery under Washington law.

8                          **IV.    CONCLUSION**

9           Following a trial to the court, and in accordance with the foregoing findings of fact

10   and conclusions of law, the court hereby ORDERS the Clerk to enter judgment in favor

11   of the Government on Dr. Czarnecki's claim for assault and battery.

12          Dated this 19th day of January, 2017.

13

14

15   JAMES L. ROBART
     United States District Judge

16

17

18

19

20

21

22

ORDER - 24